180 N.J. Super. 368 (1981)
434 A.2d 1134
CHARLES WORTHINGTON, COUNTY EXECUTIVE, AND MARIO FLORIANI, SHERIFF OF ATLANTIC COUNTY, PLAINTIFFS-APPELLANTS,
v.
WILLIAM H. FAUVER, COMMISSIONER, NEW JERSEY DEPARTMENT OF CORRECTIONS, AND BRENDAN BYRNE, GOVERNOR, STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued August 11, 1981.
Decided September 4, 1981.
*370 Before Judges KOLE[*], JOELSON and McELROY.
Salvatore Perillo, County Counsel, Atlantic County Department of Law, argued the cause for appellants (Mr. Perillo and Betty Ann Bittel, Assistant County Counsel, on the brief).
Joseph T. Maloney, Deputy Attorney General, argued the cause for respondents (James R. Zazzali, Attorney General of New Jersey, attorney; Erminie L. Conley, Assistant Attorney General, of counsel).
The opinion of the court was delivered by McELROY, J.A.D.
This matter requires consideration of Executive Order 106 issued by the Governor on June 19, 1981. This order was promulgated as a temporary measure, effective for a 90-day period, and gives authority to the Commissioner of the Department of Corrections to attempt to alleviate the dire conditions of inmate overcrowding in state and county correctional facilities by allocating the flow and movement of prisoners sentenced to state facilities from county correctional institutions and, where necessary, redistribution of such prisoners among county facilities. The principal issues raised are the Governor's power to so act and whether this particular executive action conflicts with the provisions and intent of N.J.S.A. 2C:43-10 which requires the sheriffs of the counties to deliver such prisoners to the *371 custody of the Commissioner within 15 days of the date of imposition of sentence, and N.J.S.A. 30:4-6 which directs the Commissioner's agents to receive such prisoners.
Anyone who reads the newspapers, and certainly all persons involved in the three branches of government, are aware that the counties and the State are facing a problem of prisoner housing which has lately assumed unwieldy dimensions. The record here demonstrates that at the time this suit was filed approximately 480 offenders sentenced to state institutions were in county facilities slated for transfer to overcrowded state institutions physically unable to receive them. This, in turn, created overcrowding in many counties. Although the rising rate of crime has had nationwide effect upon outdated and inadequate correctional facilities in most, if not all, of the states, it has achieved particular proportion in New Jersey because of the effects of the number and length of custodial sentences imposed by proper enforcement of the new Code of Criminal Justice, effective September 1, 1979 (N.J.S.A. 2C:1-1 et seq.), and the decrease in the grant of paroles under the Parole Act of 1979 (N.J.S.A. 30:4-123.45).
This case brings into sharp focus the present desperate need to provide proper facilities to house and maintain those convicted of crime in this era of unprecedented increase in prison population. The case pointedly illustrates not only the inadequacies and superannuated nature of most of our county jails and state prisons, but equally highlights the legislative need to reconsider statutes which limit the period during which prisoners sentenced to state institutions may be held and maintained in county facilities, as well as re-examination of the intent of such statutes. See Cryan v. Klein, 148 N.J. Super. 27 (App.Div. 1977). Also evidenced in the factual pattern presented is the necessity for centralization of the authority to determine when, in the interests of a reasonable flow of such prisoners from county holding facilities to the state institutions, this distribution should be accomplished.
*372 The requirement for placement of the power in a single authority is apparent in the fact that some counties are heavily burdened with prisoners consigned to state facilities and with those sentenced to county custody, while others are less weighed down and a few are afflicted in relatively small degree. Movement of these prisoners among the network of county facilities and, eventually, with due haste, to state institutions, can only be rationally accomplished by a central authority possessing the power to survey the populations and accommodations of all state and county institutions.
In recognition of the situation confronting the State and the counties the Governor, on June 19, 1981, issued Executive Order 106 which declared a state of emergency to exist in the various state and county correctional facilities by reason of overcrowding. The order recited that the Department of Corrections "is physically unable to accept from the Sheriffs of the various counties the custody of inmates sentenced to the custody of the Commissioner of the Department of Corrections, as mandated by N.J.S.A. 2C:43-10(e)." It noted "a need to efficiently allocate inmates of state and county penal and correctional institutions to those institutions having available space in order to alleviate overcrowding." It observed that "these unusual conditions endanger the safety, welfare and resources of the residents of this State, and threaten loss to and destruction of property, and are too large in scope to be handled entirely by regular operating services of either the counties or the New Jersey Department of Corrections." The order was declared to be in effect only during the overcrowding crisis and was designated to expire 90 days from its date of execution. The Commissioner of Corrections was designated to effectuate the provisions of the order and empowered to utilize "any available, suitable and appropriate institution or facility, whether owned by the State, a County or any political subdivision of the State... for the confinement of inmates confined in the State and/or County penal or correctional institutions." The Commissioner was given authority to transfer inmates among the various institutions in his discretion, *373 even those awaiting trial, with the exception "that only persons sentenced to a prison or committed to the custody of the Commissioner may be confined to a State Prison." The Commissioner was directed "to develop an appropriate compensation program for the counties." The executive order based its exercise of emergency powers upon N.J.S.A. App. A:9-30 et seq., an act which delineates the "Emergency Powers of the Governor."
A public statement issued by the Governor on June 23, 1981 recited that a state of emergency was declared because of overcrowded conditions in state prisons "that forced several counties to keep in their own jails offenders sentenced to [s]tate prisons." The order was described as "`an administrative tool to allow the Commissioner to equalize the burden statewide. It gives him the flexibility to take advantage of existing resources wherever they may be found in the State to alleviate temporarily the problems caused by overcrowding.'" The Attorney General was quoted in this release as characterizing the executive order as providing, "temporary measures until more permanent solutions can be found." It was noted therein that "the Department of Corrections is already the defendant in several lawsuits where the courts in four separate counties have ordered the State to accept inmates within 15 days after being sentenced to [s]tate institutions."[1]
*374 Three days before the issuance of the executive order the present plaintiffs sought, by a complaint in lieu of prerogative writs, to compel the Commissioner to accept prisoners from Atlantic County who were sentenced to state institutions. Plaintiffs based their demands upon N.J.S.A. 2C:43-10(e) and N.J.S.A. 30:4-6.
Relying principally on Cryan v. Klein, 148 N.J. Super. 27 (App.Div. 1977), plaintiffs contend that defendant Commissioner is mandated by these statutes to accept such prisoners and may not, despite the concededly overcrowded state prison conditions, refuse to receive and house them after 15 days have elapsed from the date any such prisoner was sentenced.[2] Plaintiffs also *375 assert that the executive order attempts to suspend N.J.S.A. 2C:43-10 and N.J.S.A. 30:4-6 and is therefore unconstitutional; that the Governor's statutory emergency powers do not authorize the executive order here issued; that the Commissioner's actions pursuant to the executive order is directed only to "those counties which have sued the State to accept custody of prisoners and is a retaliatory action...." and that although the matter is before this court on order of the Supreme Court directing this court to decide the validity of the executive order and all issues, the trial court nevertheless is not deprived of jurisdiction to decide the issues raised by plaintiffs' complaint. We regard these latter two issues as clearly lacking in merit and decline to treat them. R. 2:11-3(e)(1)(E). See also, R. 2:2-3(a); Markert v. Byrne, 154 N.J. Super. 410, 414 (App.Div. 1977).
Consideration of the remaining issues requires an analysis governed by concepts universally applied in matters of this nature:
(1) The executive's power, if any, to issue an emergency order must stem from either an act of the Legislature or from the Constitution itself. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).
(2) A case which seeks to declare an executive action unconstitutional as usurpation of or intrusion into the constitutional power of another coequal branch of government stirs any court to a sense of caution in its approach and to a realization of the requirement that its decision be based upon the narrowest possible ground capable of deciding the case. Dames & Moore v. Regan, ___ U.S. ___, ___, 101 S.Ct. 2972, 2991, 69 L.Ed.2d ___ (1981). General guidelines covering other possible situations are to be carefully avoided so that a particular executive *376 action. Countenanced by a given emergency or legislative delegation of power, express or implied, cannot in the future be taken as license for unwarranted extension of such power to other circumstances not here involved.
(3) Where, as here, the executive action is rooted in an assertion of emergency power alleged to be statutorily delegated either expressly or impliedly, a court must consider the extent to which the action taken bears relation to the power delegated and the emergency giving rise to the action. United States v. Yoshida International, Inc., 526 F.2d 560, 578 (CCPA 1975).
(4) Equally applicable is the principle that where the executive acts pursuant to an express or implied authorization from the legislature, he exercises not only his own powers but those delegated by the legislature. In such circumstance the executive action should be "supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." Youngstown Sheet & Tube Co. v. Sawyer, supra, 343 U.S. at 637, 72 S.Ct. at 871 (Jackson, J., concurring).
(5) In the inquiry into whether the executive action falls within those powers delegated either expressly or impliedly by an emergency powers statute, a court should realize that a legislature cannot foresee every possible emergency and thus have the wisdom to lay down narrowly definitive standards by which specific emergencies must be met by particular executive action. The concept that the legislature must surround every delegation of emergency power with detailed limitations runs contrary to the imperative inherent in the delegation of emergency powers. Yoshida, supra, at 581.
We turn now to a review of N.J.S.A. App. A:9-30 et seq. upon which the executive order is bottomed. No assistance is to be had from resort to the legislative history of this enactment; it is virtually nonexistent. The act originated in 1941 as a briefly stated war emergency measure empowering the Governor to aid the Federal Government. L. 1941, c. 393. In 1942 it *377 was broadened to provide for civilian defense and created broad executive power in that area. L. 1942, c.c. 250 and 251. The wartime flavor of the act continued, but in 1949 it assumed broader proportion and was amended to include provision for "any emergency" and for "extraordinary emergency," including those resulting "from fire, flood, earthquake or other natural causes." L. 1949, c. 86. It presently stands as it did after the 1953 amendments which further expanded its coverage. L. 1953, c. 438. Section 33 states its purpose:
The purpose of this act is to provide for the health, safety and welfare of the people of the State of New Jersey and to aid in the prevention of damage to and the destruction of property during any emergency as herein defined by prescribing a course of conduct for the civilian population of this State during such emergency and by centralizing control of all civilian activities having to do with such emergency under the Governor and for that purpose to give to the Governor control over such resources of the State Government and of each and every political subdivision thereof as may be necessary to cope with any condition that shall arise out of such emergency and to invest the Governor with all other power convenient or necessary to effectuate such purpose.
Sections 34 and 45 define the "emergency powers" of the Governor. Section 34 provides:
The Governor is authorized to utilize and employ all the available resources of the State Government and of each and every political subdivision of this State, whether of men, properties or instrumentalities, and to commandeer and utilize any personal services and any privately owned property necessary to avoid or protect against any emergency subject to the future payment of the reasonable value of such services and privately owned property as hereinafter in this act provided.
Section 45 states:
In order to accomplish the purposes of this act, the Governor is empowered to make such orders, rules and regulations as may be necessary adequately to meet the various problems presented by any emergency and from time to time to amend or rescind such orders, rules and regulations, including among others the following subjects:
........
i. On any matter that may be necessary to protect the health, safety and welfare of the people or that will aid in the prevention of loss to and destruction of property.
j. Such other matters whatsoever as are or may become necessary in the fair, impartial, stringent and comprehensive administration of this act.
*378 Thus it may be seen that the Governor is vested by this act with broad powers to cope with an emergency and, equally, to avoid or protect against "any emergency." § 34, supra.
Section 33.1 gives definition to the words "emergency" and "disaster" as used in this statute. It provides:
(1) "Disaster" shall mean any unusual incident resulting from natural or unnatural causes which endangers the health, safety or resources of the residents of one or more municipalities of the State, and which is or may become too large in scope or unusual in type to be handled in its entirety by regular municipal operating services.
........
(4) "Emergency" shall mean and include "disaster" and "war emergency" as above in this section defined.
The gradual broadening of the coverage of this act from war exigencies to any unusual incident which endangers the health, safety or resources of the residents of municipalities (which includes, of course, counties) too large in scope or unusual in type to be handled by such localities bespeaks a legislative intent to give broad temporary stopgap powers to the executive to avoid or meet a wide variety of imminent civil crises. The experience in this State with the Rahway prison riot, the recent outbreak, fortunately controlled, at Trenton, that of other states, particularly the New York experience at Attica, and the New Mexico prison riot demonstrate that aside from civilized and humane considerations, prison overcrowding creates fertile ground for unrest, tension and eventual disruption. These events have taught us that such conditions are not only dangerous to and costly of human life but highly destructive and wasteful of public property and funds. It is a matter of common knowledge, strengthened by the testimony taken below, that our state and most county correctional facilities are at the bursting point, and the situation has reached a point of crisis imminently disastrous. The counties, limited as they are in funds and bound by geographical considerations, cannot individually and immediately alleviate their problems, even temporarily, without unnecessarily adding to the overall statewide deplorable condition by flooding the state institutions with untransferable *379 inmates. Judicial orders which decree such uninhibited and untimely transfer equally add to institutional tension and unrest. Temporary centralized power to allocate transfer of prisoners to less crowded facilities may be but a finger in the dike and no ultimate answer. It is, however, a rational approach and, during a period when other temporary measures such as the installation of trailer housing and the venture to use Fort Dix are being pursued, provides lead time to possibly alleviate the crisis. Prisons obviously cannot be funded and constructed overnight. Some of this necessary construction is in process and clearly more of such facilities are needed, but it serves no valid purpose to decry, as some do, that more should have been done in the past. This type of criticism only states the problem and does not aid its present reduction or ultimate resolution. This can only be accomplished by immediate, determined and selfless action from all quarters of the government supported by an aware, concerned and realistic public.
This case, unlike Youngstown, supra, does involve a statutory delegation of emergency power. The granted ability to act is broad in sweep and, in our view of the matter, the situation presented is demonstrated to fall within that delegation of authority to act. The entire State is here faced with an unusual incident resulting from "unnatural causes" which endangers the safety, property and resources of the State and its counties. It is unusual in dimension and so large in scope as to be incapable of handling by individual counties. Plaintiffs contend that the problem cannot be deemed unusual or emergent "because the overcrowding situation in the State prisons has existed for several years." Although it is true that the present situation was predictable, it has finally arrived, and we see nothing in the broad language of the statute which so limits the statutory use of the definitive words "unusual incident" nor any reason in the present circumstances to so construe the act. Pointing to prior governmental or societal failure to react as a reason for the present crisis merely states one of several causes for the present emergency; it does not refute its existence nor diminish its *380 presence and the emergent need to solve it. We doubt that any rational mind would deny the executive's power under this statute to reasonably marshal all state, county and municipal property and resources to meet one or a series of serious inmate disruptions in state or county facilities. The statute in question does not require he await such dreadful events; it delegates the authority to "utilize and employ all the available resources of the State Government and of each and every political subdivision of this State ... necessary to avoid or protect against any emergency...." N.J.S.A. App. A:9-34. This is what the executive order seeks to do. The measures here enacted are temporary. The Legislature, by delegating to the Governor, has not abdicated its constitutional power to enact laws which may accomplish solution of the present problems. It retains its power to act and meet the present needs in similar or other ways. It may even recall, limit or redefine the emergency powers it has delegated in N.J.S.A. App. A:9-30 et seq. if it so desires.
Likewise, it is clear that the measures prescribed by this executive order, for reasons already stated, bear reasonable relationship to the powers statutorily delegated and the emergency giving rise to the executive action. We so hold.
Finally, we consider plaintiffs' contention that the steps taken in and pursuant to the executive order conflict with the intent of N.J.S.A. 2C:43-10 and N.J.S.A. 30:4-6, as the intent of these statutes was interpreted by this court in Cryan v. Klein, 148 N.J. Super. 27 (App.Div. 1977). That case held that N.J.S.A. 2A:164-18, the forerunner of N.J.S.A. 2C:43-10, was mandatory in the sense that the Commissioner was obliged to receive from a county sheriff a prisoner sentenced to a state institution within 20 days after sentence. We do not, in these circumstances, regard the decision in that case as controlling. Although that case involved a situation of inmate congestion in state institutions, the refusal of the Commissioner to accept prisoners was the result of departmental policy and was not, as here, *381 based upon lawful executive order rooted in conditions of institutional overcrowding of severe dimension. The court was not confronted with the issue of the effect of an executive order.
The Cryan decision, on close reading, is founded upon an interpretation of N.J.S.A. 2A:164-18, which recognizes that the statute made the transfer of state prisoners from a county to the custody of the Commissioner mandatory because the Legislature intended to quickly relieve counties of the financial burden of housing such prisoners. Thus, we noted that, absent "legislative authority, there is no basis for the State to foist the care and maintenance of prisoners on the counties." Id. at 31. We therefore concluded that, "the `practical' solution of delaying their admittance in the state institution, thereby causing the county to incur expense normally the obligation of the State, is contrary to law." Id. 32. We held, on a review of the various statutes granting the Commissioner the power to control the housing, employment and transfer of inmates among correctional institutions, that these acts did not "implicitly empower the Commissioner to compel county governments to assume a share of the burden for maintenance of criminally sentenced defendants in the face of a statutory duty to accept the prisoners in a state institution." Id. at 33. Finally, we noted that N.J.S.A. 30:4-85, which authorized the Commissioner to contract with counties for such prisoner maintenance, was the method, under circumstances, then present, available to the Commissioner to meet the problem, but only by consensual agreement between the State and the county. Id. See, also, N.J.S.A. 30:4-85.1.
We do not regard the legislative intent in either N.J.S.A. 2C:43-10, its predecessor, N.J.S.A. 2A:164-18, or N.J.S.A. 30:4-6 so compulsive as to limit the valid exercise of delegated emergency powers and thus render the Governor impotent to take the reasonable measures set forth in this executive order. This is especially so where, as here, the executive order makes provision for payment to counties of costs incurred. It has been said, and with fair measure of reason, that "if every law applicable to tranquil times were required to be followed in *382 emergencies, there would be no point in delegating emergency powers and no adequate, prompt means for dealing with emergencies." United States v. Yoshida, supra, 526 F.2d at 583. The clear intent of the broad and extensive powers delegated by N.J.S.A. App. A:9-30 et seq. is that the Governor should have the means to deal withan emergency successfully, at least until the Legislature acts. The Legislature did not intend that the separation of powers doctrine be abrogated or that the Constitution be nullified, but the specific power here delegated to "utilize and employ all the available resources of ... each and every political subdivision of this State, whether of men, properties or instrumentalities ... to avoid or protect against any emergency" clearly gives authority, in these particular circumstances, to utilize and employ, temporarily, county correctional facilities, fairly paid for, as needed, without the contractual consent of the political subdivision whose resources, property, instrumentalities and men are so used.
We conclude that the temporary emergency executive order bears reasonable relation to and is authorized by statutory requisites of N.J.S.A. App. A:9-30 et seq., and that it therefore passes constitutional muster. On this record we cannot say that the steps thus far taken by the Commissioner on a statewide basis fail to accord with the purposes of the executive order. Accordingly, the complaint filed below is dismissed without costs and judgment is entered in favor of defendants.
JOELSON, J.A.D., dissenting.
The majority opinion starts with a description of Executive Order 106 as a "temporary measure, effective for a 90 day period...." It is undoubtedly true that the order, which was dated June 19, 1981, provides that it "shall remain in effect for a period of ninety days from the date of execution...." If there were any assurance that it would not be extended or subsequently renewed upon the expiration of the 90-day period, there would be no compelling need for this dissenting opinion. As a matter of fact, this whole controversy might well be considered *383 moot because of the brief life span left to the executive order before the 90-day period expires.
This dissent is written only because of the distinct possibility that, after testing the judicial waters and obtaining our imprimatur on the constitutionality of his action, the Governor may decide to extend or later renew his executive order for another 90-day term and then for another and another, indefinitely. We have received no representation from defendants, either in their brief or at oral argument, that this will not be done. In view of the possibility of lengthy extension or renewal of the executive order, this member of the appellate panel believes that his views on this important issue should not go unexpressed.
There are two grounds for this dissent: (1) the executive order in question is invalid as an improper invasion by the executive branch of the province of the legislative branch; (2) even if the executive order were to be regarded as valid, it was implemented by the Commissioner of the Department of Corrections in such a way as to be arbitrary, capricious and unreasonable.

Concerning the validity of the executive order.
N.J.S.A. 2C:43-10(e) clearly and unambiguously provides:
In all cases where the defendant, upon conviction, is sentenced by the court to imprisonment, for any term of 1 year or greater, the sheriff of the county or his lawful deputy shall, within 15 days transport him to the State Prison and there deliver him into the custody of the Commissioner of the Department of Corrections....
As a corollary to this, N.J.S.A. 30:4-6 requires that state prison and correctional institution officials "shall receive" such prisoners.
In Cryan v. Klein, 148 N.J. Super. 27 (App.Div. 1977), certif. granted 75 N.J. 606 (1978)[1], we considered N.J.S.A. 2A:164-18, which was the precursor of N.J.S.A. 2C:43-10(e), and N.J.S.A. *384 30:4-6. As pointed out in the majority opinion, we held in Cryan that the word "shall" is used in these statutes in the mandatory sense, and we added that, "absent legislative authority, there is no basis for the State to foist the care and maintenance of prisoners on the counties." Id. 148 N.J.Super at 31. We further stated that in the absence of an agreement between the State and county, there is nothing in Title 30, of the Revised Statutes "to implicitly empower the Commissioner to compel county governments to assume a share of the burden for maintenance of criminally sentenced defendants in the face of a statutory duty to accept the prisoners in a state institution...." Id. at 33. The majority would limit the application of Cryan to disputes between the State and a county over which political subdivision must bear the cost of housing and maintaining the inmates. However, as we said in Cryan: "We discern no reason to rule that the applicable statutes do not mean what they say." Id. at 31.
The executive order under consideration seeks to undermine and disregard a clear legislative mandate. This is contrary to the doctrine of the separation of powers which has served our State and Nation so well and is expressly included in the New Jersey Constitution, which provides as follows:
The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution. [N.J. Const. (1947), Art. III, § 1]
Chief Justice Vanderbilt examined the doctrine of separation of powers in Massett Bldg. Co. v. Bennett, 4 N.J. 53 (1950). While acknowledging that no rule of thumb will cover all cases, he stated that "in general it may be said that no deviation from the constitutional provisions incorporating the doctrine of the separation of powers will be tolerated which impairs the essential integrity of one of the great branches of government." Id. at 57. Applying that guideline to the present case, the attempt by the executive branch to abrogate unambiguous and firm legislative enactments should not be tolerated. Although no *385 outcry against the executive order is audible from legislative chambers, we should nevertheless be unwilling to announce a new doctrine of surrender of legislative authority through silence.
However, defendants contend that the executive order of the Governor is "a clear exercise of the powers delegated to him by the Legislature." In so doing they rely entirely on the Civilian Defense and Disaster Control Act, N.J.S.A. App. A:9-30 et seq. They base their reliance specifically on N.J.S.A. App. A:9-33, which confers broad powers on the Governor "during any emergency." N.J.S.A. App. A:9-33.1(4) defines "emergency" to mean and include "disaster" and "war emergency." Since we are obviously not dealing with a war emergency, the so-called emergency can only be based upon the occurrence of disaster. N.J.S.A. A:9-33.1(1) defines "disaster" as follows:
"Disaster" shall mean any unusual incident resulting from natural or unnatural causes which endangers the health, safety or resources of the residents of one or more municipalities of the State, and which is or may become too large in scope or unusual in type to be handled in its entirety by regular municipal operating services.
One must torture this definition of "disaster" until it screams in anguish to get it to include prison overcrowding. Prison overcrowding is a deplorable condition rather than an "unusual incident." The power accorded the Governor by the Civilian Defense and Disaster Control Act was obviously intended to allow him to cope with a sudden and unforeseen event which endangers public safety. Prison overcrowding in New Jersey can hardly be regarded as sudden or unforeseen. It should be emphasized that undoubtedly this is not a situation arising so suddenly that there is no time for the Governor to urge appropriate legislative action. As acknowledged in defendants' brief, "the need for more prisons to house sentenced inmates was articulated as early as 1977 in the New Jersey Correctional Master Plan. ..." Although some bond issues have been authorized for prison construction, such remedial actions as have been taken have consistently been unequal to the magnitude of the *386 problem. The chickens of "too little and too late" now have come home to roost and the present Legislature is in charge of the coop.
Fortunately, government is not powerless to deal with the problem. It was conceded by plaintiffs' counsel at oral argument that there is no impediment to the Legislature immediately authorizing the Commissioner of the Department of Corrections to suspend the operation of N.J.S.A. 2C:43-10(e) and N.J.S.A. 30:4-6 in precisely the same manner that the Governor's Executive Order sought to do. Although the executive branch cannot take measures incompatible with legislation, there is no reason why the Legislature cannot re-examine its own legislation to cope with a developing crisis. It does not appear that the Governor has ever even requested from the Legislature the authority for the executive action he has taken. There is no reason why he cannot so urge at once. If necessary, he can convene a special session of the Legislature for that purpose under the 1947 New Jersey Constitution, Art. V, § I, par. 12.
There can be no disagreement with the majority opinion's view that if serious disruptions occur at a state penal institution, the executive branch must have inherent power to deal with the situation. However, this does not mean that in order to forestall a possible disruption, the Governor can countermand the expressed will of the Legislature. We are dealing with a situation where there is still time for the Governor to seek and obtain legislative action to help defuse what is concededly a potentially explosive situation. Given the dimensions of the problem, it is to be expected that the Legislature will act rather than risk the sorry solution of court-ordered release of less dangerous inmates which has occurred in other jurisdictions. The purpose of this dissent is to respect, not denigrate, the responsibility of the legislative branch and to recognize its ability to act expeditiously to address a problem within its *387 proper sphere, even though that might involve thorny political considerations. We must not demean the Legislature by assuming that it will shrink from the performance of its duty in the face of a crisis when urged by the Governor to meet it.
Before concluding this discussion of the validity of the executive order, reference should be made to two U.S. Supreme Court cases cited in the majority opinion: Dames & Moore v. Regan, ___ U.S. ___, 101 S.Ct. 2972, 69 L.Ed.2d ___ (1981), and Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). It is respectfully submitted that in the final analysis these cases undermine rather than bolster the majority position.
Youngstown Sheet & Tube Co. v. Sawyer is an important case in which the Supreme Court overturned the executive order of President Truman directing seizure of steel mills during a strike. The court held that neither the Constitution nor statute cloaked the President with the power he tried to assume, and ruled that the seizure was in conflict with the provisions of the Taft-Hartley Act which Congress had previously enacted. In a concurring opinion Justice Jackson wrote: "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb...." 343 U.S. at 637, 72 S.Ct. at 871. The concurring opinion of Justice Douglas contains language strikingly appropriate to the case we are now considering. After acknowledging the adverse effect a steel strike would have on the national economy, Justice Douglas stated:
... But the emergency did not create power; it merely marked an occasion when power should be exercised. And the fact that it was necessary that measures be taken to keep steel in production does not mean that the President, rather than the Congress, has the constitutional authority to act. [343 U.S. at 629, 72 S.Ct. at 886.]
Similarly, the recent case of Dames & Moore v. Regan, supra, recognizes the need for legislative authority for presidential *388 action. It upheld the action of President Carter in blocking the removal or transfer of Iranian assets at the time of the hostage crisis, but only because the President's action was authorized in advance by Congress under the International Emergency Economic Powers Act.

Concerning the implementation of the executive order.
By virtue of the executive order, the Commissioner of the Department of Corrections wrote on June 26, 1981 to the warden of the Atlantic County jail designating the county jail as the place of confinement of 35 named prisoners who otherwise were scheduled for transfer to state penal institutions. He followed with a letter dated July 8, 1981, notifying the warden that pursuant to the executive order the county jail was designated "as the temporary place of confinement for all persons currently sentenced by the courts in Atlantic County to the care and custody of the Commissioner of the New Jersey Department of Corrections." Although the record is unclear as to what has happened since then, there is no doubt that a relatively large number of prisoners who would normally have been required to be delivered to the state correctional authorities now remain in the Atlantic County jail by virtue of the Commissioner's use of the executive order.
Regardless of the question of the validity of the executive order, its use by the Commissioner in Atlantic County was arbitrary, capricious and unreasonable. It is firmly settled that such action by an administrative or executive agency should be overturned. Henry v. Rahway State Prison, 81 N.J. 571, 580 (1980); Mayflower Securities v. Bureau of Securities, 64 N.J. 85, 93 (1973); Campbell v. Civil Service Dep't, 39 N.J. 556, 562 (1963).
After stating that the State Prison and other state penal and correctional institutions are housing inmates beyond their capacities, *389 the executive order makes the following important findings:
WHEREAS, many county penal institutions of the various counties are also presently overcrowded and are housing inmate populations in excess of their capacities while other county penal institutions have available space for additional inmates; and
WHEREAS, there is a need to efficiently allocate inmates of state and county penal and correctional institutions to those institutions having available space in order to alleviate overcrowding....
In granting authority to the Commissioner, the executive order provides in paragraph 6:
When it appears to the satisfaction of the Commissioner that an inmate should be transferred to a penal or correctional institution or facility of the State or the various counties more appropriate for his needs and welfare, or that other inmates, or the security of the institution in which he has been confined, he shall be authorized and empowered to designate the place of confinement to which the inmate shall be transferred.
The reasonableness of the application of the executive order to Atlantic County must be examined in the light of the clearly expressed intent of that order to transfer to under-utilized county facilities those prisoners who would normally be in state institutions. In such light, its present application to Atlantic County is unsupportable. It is not reasonable for state officials to dump their problems on county officials who already have the same or worse problems. We should not overlook the fact that this case was started even before the Governor promulgated his executive order. Because of the jam-packed condition at the county jail, plaintiffs brought the action to compel the State to accept delivery of prisoners promptly under N.J.S.A. 2C:43-10(e) and N.J.S.A. 30:4-6.
Defendants concede in their brief that the jail in Atlantic County is "overcrowded." They apparently accept the findings of fact by the Atlantic County Assignment Judge made before the lower court action was aborted by the executive order. That judge found that "Atlantic County Jail had a rated capacity of 185 inmates but had a population far in excess of that number." "Plaintiffs' brief refers to testimony by the warden *390 of the county jail which specifies the deplorable conditions resulting from this overcrowding.
The warden stated that he has found it necessary to have 45 to 50 inmates sleep on mats on floors or tables. Hardened criminals must be mixed with those less dangerous; new inmates are placed in the general population before they can be medically quarantined; potentially suicidal inmates cannot be segregated; recreation has been reduced to approximately once every two weeks from twice a week. He further testified that state prisoners who taunt the guards and hurl water and urine at them cannot be disciplined because "all the isolation cells and special cells are taken." He said that three or four fires have been set in housing units, that inmates removed to the gymnasium as a result caused considerable damage and refused to come out until subdued by tear gas.
It is also important to keep in mind the fact that the county jail in Atlantic is operating under a federal court order which is monitored by a special master, Professor John Richert. He testified that the overcrowding will make it "impossible" for the county to comply with the court order. He expressed the opinion that "the situation is much worse in the county jails than in the state prisons."
Testimony also disclosed that the county has taken drastic steps to reduce its county jail population. These steps include "conditional release" of persons who would ordinarily be required to post bail, and even the release of all jail inmates sentenced on disorderly persons charges.
In view of the foregoing, the Commissioner's action was contrary to the expressed intent of the executive order to "allocate inmates of state and county penal and correctional institutions to those institutions having available space in order to alleviate overcrowding." Therefore, such action was arbitrary, capricious and unreasonable.
NOTES
[*] Judge Kole concurred in the majority opinion prior to his retirement on August 31, 1981.
[1] These orders are not before this court except in a tangential sense. The trial court in this matter issued no such order. When the executive order was defensively raised below, the trial judge, sensitive "to the grave problems that have beset our penal institutions" and "in an effort to obtain a uniform statewide ruling to guide many assignment judges in their decisions on these matters," ordered "that the matter of the validity and effect of Executive Order No. 106 be heard in the Appellate Division R. 1:1-2." We view the matter as properly before us. R. 2:2-3(a); Markert v. Byrne, 154 N.J. Super. 410, 414 (App.Div. 1977). Plaintiffs sought and were denied temporary relief from the executive order in this court and the Supreme Court. In its order of July 14, 1981 the Supreme Court directed that the matter be "transferred to the Appellate Division for disposition of all issues on the merits." It also ordered that the record on appeal include the transcripts of hearings held by the court below on July 1, 10 and 13, 1981. Those proceedings, by stipulation, include the transcript of testimony taken at a hearing held before the same judge in a Cumberland County action involving the same issues. The order entered in the Cumberland County matter is not raised before us for review.
[2] We do not view this assertion as purely parochial or self-centered; the record below demonstrates severe overcrowding in the county facility, as indeed, it demonstrates the same housing problem in state institutions. The desperate situation in this county, other counties and in the state facilities only serves to emphasize the need for the political subdivisions of the State to support temporary solutions for reallocation of offenders pending a more permanent resolution of this crisis. We are, however, constrained to observe that when each afflicted county insists on its assumed right to be quickly relieved of such inmates, the problem, which is a statewide one, is not resolved; it is only intensified and placed upon equally inadequate state facilities. Under recent legislation the State is empowered to offer and install trailers at county facilities to ease overcrowding. L. 1981, c. 209. Low security risk inmates may be placed in such housing, thereby opening up more secure county jail areas for the temporary holding of high risk state prisoners. In a reply brief plaintiffs herein "adamantly maintain that if the State sees trailers as a temporary solution to the space shortage, the State should install the trailers on its property and keep the State prisoners there...." We note that the record reflects that trailers are being used by the State and that other counties have expressed the desire to assist in easing their own problems and that of the State by utilizing such trailers. We are sure that the statement quoted above is only reflective of the heat engendered by any litigation and this serious problem as it particularly affects Atlantic County. We therefore do not regard it as indicative of an intractable rejection of the common purposes necessary to resolution of this statewide crisis.

The testimony adduced below indicates that the State is taking steps to alleviate the situation by negotiating with Sussex County to take approximately 30 inmates and with Mercer County to secure approximately 50 beds. Discussion has been had with the federal authorities to obtain permission to use facilities at Fort Dix, New Jersey.
[1] Defendants' brief advises that the Supreme Court vacated its certification because the matter was subsequently settled.