240 N.J. Super. 269 (1990)
573 A.2d 186
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
DAVID MAURE, DEFENDANT-RESPONDENT.
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
RAYMOND HOBBS, HAROLD PETTY AND DANIEL HOBART, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 21, 1990.
Decided April 17, 1990.
*271 Before Judges KING, SHEBELL and BAIME.
Stephen H. Monson, Deputy Attorney General, argued the cause for appellant (Robert J. Del Tufo, Attorney General, attorney).
Riaz Mian argued the cause for respondent (Voorhees, Bennett & Wherry, attorneys; Riaz Mian on the brief).
Larry E. Holtz, Assistant Prosecutor, argued the cause for appellant (Stephen G. Raymond, Burlington County Prosecutor, attorney; Larry E. Holtz of counsel and on the letter-brief).
James R. Bodnar argued the cause for respondent Hobbs (James R. Bodnar on the letter-brief).
Carl L. Taraschi argued the cause for respondent Petty (Carl L. Taraschi on the brief).
Mark W. Catanzaro argued the cause for respondent Hobart (Mark W. Catanzaro on the letter-brief).
The opinion of the court was delivered by BAIME, J.A.D.
We granted the State's motion for leave to appeal in these consolidated cases in order to address questions pertaining to the foundational basis requisite to admission of breathalyzer readings. At issue is whether State Police Coordinator's certifications indicating that ampoules from the same batch as those used in the administration of breathalyzer examinations of the defendants were randomly selected and tested satisfy the requirement of spot checking in the absence of proof of independent laboratory analysis. We hold that spot checking of random ampoules by trained members of the State Police is sufficient prima facie proof that ampoules used in testing the defendants were properly constituted and mixed to proper proportions.

*272 I.
We need not recount the facts at length. Defendants Raymond Hobbs, Harold Petty and Daniel Hobart were charged with driving while intoxicated in unrelated incidents (N.J.S.A. 39:4-50(a)). On July 17, 1983 the three defendants appeared with their attorneys in the Springfield Township Municipal Court and requested a consolidated Evid.R. 8 hearing, seeking to exclude the breathalyzer readings from evidence in their respective trials.
The hearing transcript discloses the following salient facts. The ampoules used in testing each defendant were taken from the same batch identified as lot number 70902. The ampoules were manufactured by Guth Laboratories. As is customary, Guth Laboratories supplied random sample ampoules to Galbraith Laboratories for independent analysis of their chemical composition. At the Evid.R. 8 hearing, the State presented a certificate of analysis, commonly known as an assay certificate, prepared by Galbraith Laboratories attesting to the fact that the sample ampoules were tested and were found to be properly constituted and properly mixed to the correct proportions. The uncertified and un-notarized certificate was purportedly signed by Gail R. Hutchins, the executive vice-president of Galbraith Laboratories.
Defendants challenged the authenticity of the assay certificate, claiming that Hutchins' signature was not genuine. In support of their argument, defendants presented other certificates allegedly executed by Hutchins. It is undisputed that each of the signatures that appeared on the respective documents was vastly different. In response, the prosecutor, while agreeing that not all of the signatures were genuine, refused to stipulate with respect to which of the certificates was actually signed by Hutchins. The prosecutor represented from "personal knowledge" that Hutchins does not sign the certificates "in each and every case," but instead "has authorized" others "in her office" to execute these documents.
*273 The prosecutor also contended that an assay certificate is not a prerequisite for admission of breathalyzer test results. Relying on our published decisions in State v. Ernst, 230 N.J. Super. 238, 553 A.2d 356 (App.Div. 1989), certif. den. 117 N.J. 40, 563 A.2d 811 (1989), and State v. Ettore, 228 N.J. Super. 25, 548 A.2d 1134 (App.Div. 1988), certif. den. 114 N.J. 473, 555 A.2d 600 (1989), the prosecutor introduced the certified statements of a State Police Coordinator representing that he had tested random samples from the same batch as those used in the breathalyzer tests administered to defendants and that they had registered correct readings. More specifically, the certificates admitted into evidence read in pertinent part as follows:
I am a Breath Test Coordinator Instructor, empowered by the Attorney General of the State of New Jersey, pursuant to the provisions of P.L. 1966 c. 142 S3 as amended (C. 39:4-50.3) and rules and regulations adopted thereunder, to perform inspection and maintenance of approved instruments for performing chemical analysis of a person's breath. I hereby affirm that I have inspected the approved instrument designated on this certificate. I further attest that this document contains a true, accurate and complete record of the inspection and maintenance performed herein, including random sample testing of ampoules used in the operation of this approved instrument as is evidenced by the ampoules control number(s) designated on this certificate.
Pursuant to regulations promulgated by the State Police, N.J.A.C. 13:51-3.4 and 3.6, the inspection of the breathalyzer instrument and the random sampling of ampoules from the same batch had taken place before and after the tests administered to the defendants.
Based upon the foregoing evidence and the absence of a properly authenticated assay certificate, the Municipal Court judge suppressed the breathalyzer readings in each case. In an oral opinion, the judge determined that the assay certificate was not properly authenticated because substantial questions existed with respect to the genuineness of Hutchins' signature. The judge also found that the State Police Coordinator's certifications did not provide a sufficient foundational basis for admission of the breathalyzer results.
The Superior Court, Law Division, granted the State's motion for leave to appeal and affirmed the Municipal Court's order. *274 In a written opinion, the judge concluded that an assay certificate attesting to the proper chemical composition of randomly selected ampoules constituted an indispensable prerequisite to admission of breathalyzer results. Citing our opinions in State v. Dohme, 223 N.J. Super. 485, 538 A.2d 1321 (App.Div. 1988) (Dohme I), and State v. Dohme, 229 N.J. Super. 49, 550 A.2d 1232 (App.Div. 1988) (Dohme II), the Law Division judge held that the State Police Coordinator's certifications were infirm because they provided no basis for an inference that the ampoules randomly tested and the ampoule used in the defendants' breath examinations were homogeneous in chemical composition.
Because of the importance of the issue raised, we granted the State's motion for leave to appeal and scheduled oral argument on an expedited basis. During the pendency of this appeal, the Attorney General requested us to directly review another case in which the Allentown Municipal Court had excluded the results of a breathalyzer test on the basis of the State's failure to produce an assay certificate. More specifically, defendant David Maure successfully moved for suppression of his breathalyzer readings in an Evid. R. 8 hearing. At a prior hearing, the Attorney General had apparently conceded that the genuineness of Hutchins' signature on the assay certificate could not be established. The State thus relied entirely upon State Police Coordinator certifications identical to those discussed previously. In addition, the State presented detailed testimony regarding uniform procedures utilized by State Police Coordinators in their random sampling of ampoules.
When the State's motion was presented to us, we questioned whether our rules of practice permit a direct appeal to this court from an interlocutory order of a Municipal Court. Compare R. 2:2-3(b), with R. 2:2-4. We nevertheless decided to grant the Attorney General's motion and consolidate the State's appeal in the Maure case with the others. We now explain our reasons. Whether or not our rules expressly authorize *275 a direct appeal from a Municipal Court's non-final order, the parties have consented to this procedure under the unusual circumstances presented. We are convinced that the interests of justice militate strongly in favor of this approach and, to the extent that the extraordinary action we have taken is inconsistent with normal procedures, our rules should be relaxed. See R. 1:1-2. In reaching this conclusion, we have considered the uneven treatment our reported opinions have given to questions relating to the requirement of spot checking, compare State v. Ernst, 230 N.J. Super. at 244, 553 A.2d 356; State v. Ettore, 228 N.J. Super. at 31-32, 548 A.2d 1134, with State v. Dohme I, 223 N.J. Super. at 488, 538 A.2d 1321; State v. Dohme II, 229 N.J. Super. at 52-53, 550 A.2d 1232, and the urgency created by the crushing number of driving while intoxicated cases whose ultimate disposition depends upon resolution of the issue raised.
The simple and overriding fact is that the Maure case provides us with a detailed record which is wholly lacking in the other appeals. We have been assured that essentially the same record would be made were we to remand the Hobbs, Petty and Hobart matters for a hearing with respect to the procedures employed by the State Police in randomly sampling breathalyzer ampoules. We have thus granted the Attorney General's motion with the aim of expeditiously deciding the difficult issue presented.

II.
We digress briefly in order to describe the manner in which breathalyzer ampoules are manufactured, tested and distributed in interstate commerce. An ampoule is a sealed cylindrical container with a solution of potassium dichromate, silver nitrate and sulphuric acid. To conduct a test, the seal on the test ampoule is broken and the breath sample is bubbled through that solution. Romano v. Kimmelman, 96 N.J. 66, 79, 474 A.2d 1 (1984). Any alcohol in the breath reacts with the potassium dichromate and effectively fades the color of the *276 solution, thereby energizing a photoelectric cell which in turn moves a meter needle. Ibid.
Manufacturers produce the chemical solution in vats and assign a "lot number" to a "batch" after it is produced in bulk. See People v. Nieves, 143 Misc.2d 734, 739-741, 541 N.Y.S.2d 1008, 1012 (N.Y.City Crim.Ct. 1989). Although the record is not altogether clear, it appears that a "batch" is composed of approximately 25,000 ampoules. Of these ampoules, 25 are tested by an independent laboratory for their chemical composition. If the ampoules meet the requisite standards, an assay certificate is prepared and sent to the manufacturer. Ampoules are then distributed in interstate commerce in boxes of 25. A copy of the assay certificate with the corresponding lot number is placed in each container.
Under regulations promulgated by the Department of Law and Public Safety, all breathalyzer instruments must be approved by the Attorney General. N.J.A.C. 13:51-1.2. In turn, the Attorney General has designated the Superintendent of State Police "to whom all applications for approval of instruments ... shall be made." N.J.A.C. 13:51-3.2. All breathalyzer machines are periodically tested by specially trained State Police Coordinators. N.J.A.C. 13:51-3.3 and N.J.A.C. 13:51-3.4. We need not describe in detail the procedures employed in inspecting the components of each breathalyzer machine. It suffices to note that the State Police Coordinator conducts a preliminary test of the cylinder output, the optical system, balance and lost motion and temperature variances. See, e.g., N.J.A.C. 13:51-3.6.
In the course of each inspection, the State Police Coordinator selects at random at least two ampoules from the container of 25. Utilizing an alcohol simulator, a vessel containing 500 milliliters of the prepared solution maintained at a constant temperature and, by way of an agitator, kept at an appropriate homogeneous concentration, the content of the container is emptied into a flask filled to a calibration line with a balance of *277 distilled water. This results in a working simulator solution which is discharged into the breathalyzer. The breathalyzer captures an appropriate volume of the sample. The instrument is considered accurate if it registers readings of .09 to .105. The.09 limit is consistent with guidelines which recognize a potential variance of .005 attributable to alcohol depletion with successive testing. The actual alcohol content of the simulated solution is .12 and this produces a vapor alcohol of .10. This test is repeated. If the readings fall within the acceptable range, the breathalyzer instrument is approved and the remainder of the ampoules is considered to be acceptable for use. Thus, a minimum of two ampoules are tested at each inspection. Where, as here, State Police Coordinator certifications for inspections both before and after a defendant's test are presented, the result is that many times four and often more ampoules from the same batch have been tested and found reliable. Here, for example, a minimum of four ampoules from the same batch as that used in administering the breathalyzer examination to a defendant have been randomly tested and certified as yielding a correct reading.

III.
Against this factual backdrop, we consider the State's argument that admission of State Police Coordinator certifications pertaining to inspections made both before and after the tests administered to defendants satisfied the requirement of spot checking of ampoules long mandated by our cases. We begin our analysis by placing the issue in its historical perspective.
In 1964, our Supreme Court rendered its decision in State v. Johnson, 42 N.J. 146, 199 A.2d 809 (1964), holding that a breathalyzer is sufficiently established and accepted as a scientifically reliable and accurate device for determining the alcoholic content of the blood to admit testimony of the readings obtained upon a properly conducted test. That decision was in *278 keeping with a long line of lower court opinions upholding the admission of breathalyzer test results in drunk driving cases. See, e.g., State v. Burger, 74 N.J. Super. 208, 181 A.2d 30 (App.Div. 1962); State v. Protokowicz, 55 N.J. Super. 598, 151 A.2d 396 (App.Div. 1959); State v. Greul, 59 N.J. Super. 34, 157 A.2d 44 (Cty.Ct. 1959); State v. Damoorgian, 53 N.J. Super. 108, 146 A.2d 550 (Cty.Ct. 1958); State v. Brezina, 45 N.J. Super. 596, 133 A.2d 366 (Cty.Ct. 1957). The decision was also consistent with those of other jurisdictions which had found that breathalyzer instruments yielded accurate breath alcohol concentration results. See Slough and Wilson, "Legal By-Products of Chemical Testing for Intoxication," 11 Clev.-Mar. L.Rev. 1 (1962). Despite repeated challenges over the years, the Court has consistently held that the breathalyzer "reads alcohol with unimpeachable accuracy" and "is unsurpassed in its combined practicality and usefulness." State v. Downie, 117 N.J. 450, 468-469, 569 A.2d 242, 251 (1990). See also State v. Tischio, 107 N.J. 504, 527 A.2d 388 (1987); Romano v. Kimmelman, 96 N.J. 66, 474 A.2d 1 (1984).
Our Legislature has also placed great confidence in the breathalyzer in seeking to eliminate intoxicated drivers from the roadways. That this is so is best evidenced by the evolution of the drunk driving statutes. As originally enacted, N.J.S.A. 39:4-50(a) provided only that "[a] person who operates a motor vehicle while under the influence of intoxicating liquor" shall be subject to various penalties. In 1951, the Legislature enacted N.J.S.A. 39:4-50.1 which created a presumption of intoxication upon a reading of a .15% alcohol content. Based upon a plethora of studies indicating some level of driving incapacity at blood levels well below .15%, the Legislature in 1983 again amended our statutes, making a .10 blood-alcohol level a per se offense. See, e.g., Motor Vehicle Study Commission Report to the Senate and the General Assembly of 1975, p. 135. N.J.S.A. 39:4-50(a), as currently enacted, "expresses a clear legislative purpose to rely exclusively upon breathalyzer test results whenever possible." State v. Tischio, 107 N.J. at 516, *279 527 A.2d 388. See also State v. Hammond, 118 N.J. 306, 315-318, 571 A.2d 942, 947-948 (1990).
Presently, breathalyzer test results often constitute the sole evidence against a defendant and generally alone become determinative of a violation of the law. Consequently, the risk of error should be reduced as much as possible. Romano v. Kimmelman, 96 N.J. at 90, 474 A.2d 1. Recognizing the heavy impact breathalyzer results have in drunk driving prosecutions, our Supreme Court has said that "proper administration of the test [must] be clearly established before the reading is admitted in evidence." State v. Johnson, 42 N.J. at 171, 199 A.2d 809. "This includes full proof that the equipment was in proper order, the operator qualified and the test given correctly." Ibid. In Romano v. Kimmelman, the Court stated that "[i]n drunk driving prosecutions a substantial burden of proof to establish the competence or admissibility of the results of the breathalyzer test is appropriate" because of the "serious consequences" attendant to their admission. 96 N.J. at 90, 474 A.2d 1. The Court added that "[t]o avoid any confusion over what is intended by this level of proof, it should be understood that it conforms to that standard conventionally referred to as `clear and convincing [evidence].'" Ibid.
We are concerned here with the foundational requirement that the breathalyzer instrument was "in proper order" when administered. State v. Johnson, 42 N.J. at 171, 199 A.2d 809. In that context, our decisions have long mandated clear and convincing proof that the ampoule used in testing a defendant was properly constituted. See, e.g., State v. Ernst, 230 N.J. Super. at 243-244, 553 A.2d 356; State v. Dohme II, 229 N.J. Super. at 52-54, 550 A.2d 1232; State v. Ettore, 228 N.J. Super. at 32, 548 A.2d 1134; State v. Dohme I, 223 N.J. Super. at 488, 538 A.2d 1321; State v. Dickens, 130 N.J. Super. 73, 79, 325 A.2d 353 (App.Div. 1974); State v. McGeary, 129 N.J. Super. 219, 223, 322 A.2d 830 (App.Div. 1974); State v. Hudes, 128 N.J. Super. 589, 597, 321 A.2d 275 (App.Div. 1974); State v. DeVito, 125 N.J. Super. 478, 479, 311 A.2d 753 (App.Div. 1973). *280 The problem is that only by breaking a sealed ampoule can a chemist or anyone else determine that its contents were properly prepared. State v. DeVito, 125 N.J. Super. at 479, 311 A.2d 753. The contents of the ampoule are exhausted in the test. See State v. Teare, 135 N.J. Super. 19, 22, 342 A.2d 556 (App. Div. 1975); State v. Dickens, 130 N.J. Super. at 79, 325 A.2d 353. The operator of the instrument disposes of each test ampoule at the conclusion of the examination. Ibid.; see also N.J.A.C. 13:51-3.6. Thus, the only practical way of showing that the test ampoule was mixed to the correct proportion is to offer proof of random testing of ampoules from the same batch. See State v. Dickens, 130 N.J. Super. at 79, 325 A.2d 353; State v. DeVito, 125 N.J. Super. at 479, 311 A.2d 753. "[T]he law is well settled that the spot checking of a random ampoule [of the same batch] is sufficient prima facie proof that the chemicals in the test ampoule were of the proper kind and mixed to proper proportion." State v. Dickens, 130 N.J. Super. at 79, 325 A.2d 353.
Although the thesis was recently questioned in State v. Dohme II, 229 N.J. Super. at 53, 550 A.2d 1232, it would appear that our courts have historically relied upon signed statements of State Police Coordinators in determining that the requirement of spot checking has been satisfied. See, e.g., State v. Samarel, 231 N.J. Super. 134, 141-142, 555 A.2d 40 (App.Div. 1989); State v. Ernst, 230 N.J. Super. at 243, 553 A.2d 356; State v. Ettore, 228 N.J. Super. at 32, 548 A.2d 1134; State v. Hudes, 128 N.J. Super. at 597, 321 A.2d 275; State v. DeVito, 125 N.J. Super. at 479, 311 A.2d 753. We have repeatedly held that "[t]he State's analysis of random ampoules from the same batch of ampoules as those used to test defendant was sufficient to satisfy the requirement of `spot checking'...." State v. Ernst, 230 N.J. Super. at 243-244, 553 A.2d 356. The underlying rationale for this evidentiary principle, one to which we have long adhered, is that the correct readings yielded by random sample ampoules in tests performed by State Police Coordinators, under controlled circumstances, are sufficient to *281 support the inference that the ampoule used in examining the defendant was properly constituted and mixed to correct proportions.
The validity of this policy was first questioned by another panel of this court in State v. Dohme I, 223 N.J. Super. at 487 n. 2, 538 A.2d 1321, and was subsequently rejected in State v. Dohme II, 229 N.J. Super. at 52-53, 550 A.2d 1232. The problem noted in Dohme II is that the ampoules used by the State Police Coordinator in testing the machine might differ in the chemical composition of their contents with the ampoule actually used in administering the breathalyzer examination to the defendant. 229 N.J. Super. at 53, 550 A.2d 1232. According to the court, "[t]he test ampoules drawn by the Trooper could have been taken from a batch in which a significant percentage failed to conform to proper standards, yet if a conforming ampoule was drawn, the test result would have been valid." Ibid. It was said that "[w]ithout the [assay] certificate there would be no proof that the population from which the Trooper drew the two-ampoule test was itself uniform." Ibid. The court concluded that the evidentiary problem could be cured in one of two ways. The standard State Police certification could include a reference to the inspection of the assay certificate and a reliance upon its contents, or the assay certificate could be produced at the trial. Id. at 53-54, 550 A.2d 1232.
As we will note later in our opinion, State v. Dohme II has much to commend it because any additional random sample testing increases the probability that all ampoules in the same batch are uniform. Nevertheless, we continue to adhere to the rule expressed in State v. Ernst, 230 N.J. Super. at 243, 553 A.2d 356, and our prior decisions that foundational requirements are satisfied by admitting the State Police Coordinator's certifications indicating that random sample testing of ampoules from the same batch that was used in the defendants' breathalyzer tests has been conducted both before and after those examinations. To be sure, there is no fail-safe method to assure that the ampoule used in testing a defendant was *282 properly constituted. Laboratory testing of 25 ampoules of a batch composed of 25,000 ampoules clearly adds an aura of reliability, but does not respond to all possible concerns.[1] We are satisfied that the testing of random sample ampoules by trained members of the State Police under the controlled conditions we have described provides a sufficient basis to support the thesis that the ampoule used in examining a defendant was properly constituted.
We surmise that ampoules with the same batch number contain a solution uniform in composition. The production process, as described in People v. Nieves, is that the manufacturer "assigns a lot number to the product as it is prepared in bulk." 143 Misc.2d at 739-741, 541 N.Y.S.2d at 1012. In our prior decisions, we have assumed that ampoules stamped with the same batch number are filled with a constant composition. State v. Dohme II, 229 N.J. Super. at 53-54 n. 2, 550 A.2d 1232. The solution contained in the ampoules bearing the same batch number is presumed to be homogeneous.[2] We are convinced that this presumption coupled with the random testing of ampoules of the same batch as that used in the defendant's breathalyzer examination adquately satisfy the spot checking requirement.
We are not inclined to cast the burden on the State of offering further or additional proof of the accuracy and validity *283 of the tests employed by the State Police in spot checking random ampoules. Beyond such tests lie tests of the devices used to test other measuring devices. These tests must end somewhere, and we are of the view that the procedures employed by the State Police are reasonably reliable. We do not doubt defendants' sincerity in attacking the adequacy of these procedures. However, the oft-heard layman's opinion that the enforcement of the law can be frustrated by a "legal bag of tricks" must not be encouraged by slavish adherence to hyper-technical requirements of myriad testings. See People v. Stephens, 52 Misc.2d 1070, 1072, 277 N.Y.S.2d 567, 569-570 (Cty. Ct. 1967), cited in State v. Overton, 135 N.J. Super. 443, 448, 343 A.2d 516 (Cty.Ct. 1975). In short, we are thoroughly convinced that random sample testing by trained members of the State Police is reasonably reliable and yields appropriate results.
We emphasize the narrow scope of our opinion. We stress that our holding pertains solely to the bare foundational requirement of spot checking. We do not suggest that State Police Coordinators' certifications are unassailable or that once the breathalyzer readings are admitted they cannot be challenged by evidence that the test ampoule was in some way defective. As in these cases, ampoules from the same batch are commonly supplied to the defendant in pretrial discovery and, of course, may be subjected to chemical analysis. While our Supreme Court has said that "[t]he primary purpose of N.J.S.A. 39:4-50.1 [creating a per se offense] was to eliminate the necessity for expert and other testimony relating to the existence and degree of intoxication," State v. Hammond, 118 N.J. at 317, 571 A.2d at 947, quoting State v. Tischio, 107 N.J. at 515, 527 A.2d 388, it is far different to say that the reliability of the breathalyzer readings cannot fairly be challenged at trial. In any event, we merely hold that State Police Coordinator certifications indicating that random sample ampoules from the same batch as that used in the defendants' breathalyzer examination have been tested satisfy the spot checking requirement.
*284 Although the decisions of other jurisdictions are subject to varying interpretations, we are of the view that the better reasoned opinions comport with our holding here. Compare State v. Zaragoza, 21 Ariz. App. 596, 522 P.2d 552 (App.Ct. 1974); State, Dept. of Public Safety v. Habisch, 313 N.W.2d 13, 15-16 (Minn. 1981); Jannett v. King, 687 S.W.2d 252, 254 (Mo. App. 1985); State v. Bush, 595 S.W.2d 386 (Mo. App. 1980); State v. Gerber, 206 Neb. 75, 91-92, 291 N.W.2d 403, 412 (Neb. 1980); State v. Sherrill, 15 N.C. App. 590, 190 S.E.2d 405 (App.Ct. 1972); State v. Baker, 56 Wash.2d 846, 854-855, 355 P.2d 806, 811 (Wash. 1960); City of Olympia v. Sprout, 5 Wash. App. 897, 492 P.2d 586 (App.Ct. 1971), with State v. Huggins, 659 P.2d 613, 617 (Ala.App.Ct. 1982); State v. Buu Dinh Tran., 542 So.2d 648, 650 (La. App.Ct. 1989); Casper v. State, 70 Md. App. 576, 583-584, 521 A.2d 1281, 1285 (Md. App. 1987), cert. den. 310 Md. 129, 527 A.2d 50 (1987); Commonwealth v. Little, 354 Pa.Super. 546, 512 A.2d 674 (Pa.Super. 1986); Murray City v. Hall, 663 P.2d 1314, 1320 (Utah 1983); Bumpus v. State, 509 S.W.2d 359 (Tex. Crim. App. 1974); State v. Walstad, 119 Wis.2d 483, 494-495, 351 N.W.2d 469, 475 (Wis. 1984). See also State v. Souza, 6 Haw. App. 554, 562, 732 P.2d 253, 259 (Hawaii App. 1987); People v. Freeland, 68 N.Y.2d 699, 701, 506 N.Y.S.2d 306, 307, 497 N.E.2d 673, 674 (N.Y. 1986); State v. Ghylin, 222 N.W.2d 864, 869 (N.D. 1974); State v. Coffman, 11 Or. App. 307, 502 P.2d 605, 607 (Or. Ct. App. 1972). Many of these decisions confirm a strongly held design to discourage long trials and endless hearings complicated by essentially pretextual defenses. While our research discloses no clear weight of authority, one way or the other, we discern a general view that breathalyzer ampoules are rarely defective. Although there have been instances of improperly manufactured ampoules, see People v. Nieves, 541 N.Y.S.2d at 1011, and Report of the Auditor General of Pennsylvania, pertaining to ampoules manufactured by Systems Innovation, Inc., these cases are few and far between.
*285 One final matter deserves emphasis before leaving the subject. Our holding is confined to the legal requirement of spot checking. We do not suggest that introduction of State Police Coordinators' certification alone without reference to the assay certificate is the preferred practice. It is not. While we disagree with our colleagues' conclusion in State v. Dohme II that reference to or production of an assay certificate is an indispensable prerequisite to admission of breathalyzer readings, we find that to be a better approach than mere reliance on State Police Coordinator certifications.
It is not our role to criticize members of the law enforcement community. We have no monopoly on justice and we recognize fully the difficulty of law enforcement efforts to curb one of the chief instrumentalities of human catastrophe, drunk driving. This much conceded, we would be remiss were we to fail to express our puzzlement with respect to law enforcement's stubborn resistance to the approach adopted by our colleagues in State v. Dohme II. It would be an extremely simple matter to slightly alter the standard State Police certification to include a reference to the inspection of the assay certificate and a reliance upon its contents. If for some reason not apparent to us this seemingly minor modification might generate problems, then clearly prosecutors could present the assay certificate at trial. Either approach would satisfy State v. Dohme II, 229 N.J. Super. at 54, 550 A.2d 1232. See also State v. Cardone, 146 N.J. Super. 23, 28, 368 A.2d 952 (App.Div. 1976), certif. den. 75 N.J. 3, 379 A.2d 234 (1977).
Instead, many members of the law enforcement community have preferred to fight rather than switch. This intransigence is all the more puzzling because the holding of our colleagues in State v. Dohme II was clearly foreshadowed by its earlier opinion rendered on March 11, 1988. See 223 N.J. Super. 485, 538 A.2d 1321. In the two-year period since State v. Dohme I was decided, literally thousands of drunk driving prosecutions and convictions have been placed in jeopardy, essentially for want of an additional sentence in the State Police Coordinators' *286 certifications. The public has not been well served in this respect.
We stress that there is no en banc procedure in the Appellate Division, and we are but three of 28 judges. Although we hope that our holding in this case is persuasive, it is no more binding on the Law Division and the Municipal Courts than is State v. Dohme II. More importantly, in light of the checkered treatment this question has received in our opinions, it is entirely possible that our holding in this case will not be the final chapter. Our Supreme Court might well choose to consider the issue, depart from our holding and accept the Dohme II approach.

IV.
We find that the Law Division erred by excluding the breathalyzer readings in the Hobbs, Petty and Hobart cases. Whether or not Hutchins' signature was genuine, the State Police Coordinators' certifications provided prima facie proof the ampoules used in testing the defendants were properly constituted. We also find that the Municipal Court judge erred by excluding Maure's breathalyzer readings.
The order of the Law Division in the Hobbs, Petty and Hobart cases and that of the Municipal Court in the Maure case are accordingly reversed. The matters are remanded to the respective municipal courts for further proceedings consistent with this opinion.
SHEBELL, J.A.D., concurring.
I concur in the result reached by the majority. I find it necessary, however, to take a more definitive stand in opposition to the holding of another part of this court in State v. Dohme, 229 N.J. Super. 49, 550 A.2d 1232 (App.Div. 1988). Dohme II correctly notes that the random sampling of two test ampoules incidental to the testing of the breathalyzer would of necessity demonstrate that the ampoules meet specifications *287 because if they did not a valid result would not have occurred. Id. at 53, 550 A.2d 1232. The Dohme II court found a shortcoming in the proofs in that "there is no statement that the particular ampoule has come from a batch of uniform and conforming specific gravity and silver nitrate, potassium dichromate and sulfate concentration, other than by a reference to an ampoule control number." Ibid. The court then asserted that "[w]ithout the [assay] certificate there would be no proof that the population from which the Trooper drew the two-ampoule test was itself uniform." Ibid. (footnote omitted).
However, resolution of the deficiency concerning the requirement of uniformity noted in Dohme II is not significantly furthered by the requirement that there be the production of a certificate of assay by an independent laboratory or a reference to the inspection of the certificate in the state police certification. The assay would only prove that out of the manufacturer's 25,000 ampoule batch, 25 ampoules were independently tested for content. This evidence does nothing substantial to support the proposition that the ampoules were uniform and manufactured from a homogeneous batch. The independent testing laboratory itself does not certify that the ampoules were manufactured from a homogeneous batch.
If we are seeking to increase the probability that certain other ampoules bearing the same control number have the same composition as those tested, the State's testing of two ampoules out of a box of 25 to be used at a particular location is of immensely greater significance than independent laboratory testing of only 25 ampoules out of a manufacturer's 25,000 ampoule run.
Returning, however, to the real issue, that is, whether or not a court should accept the proposition that all ampoules containing the same batch or control number were manufactured at the same time and as part of one operation, I, for one, am fully satisfied that the court should establish a strong, though rebuttable, presumption in favor of that proposition. We are dealing *288 with a manufacturer that compounds and prepares its product for distribution to the law enforcement community and places its product in interstate commerce. As the majority notes, a single batch or control number is given to all of the ampoules that are filled from each batch of solution. Ante at 274. The labeling of the ampoule is self-descriptive and self-explanatory. This is for the purpose of providing law enforcement with an identifiable, homogeneous product. Mislabeling would be contrary to the pecuniary interests of the manufacturer and might subject it to possible state and federal civil and criminal action.
There is sufficient reason for reliability in these circumstances for the court to establish a presumption that all ampoules containing the same batch or control number are produced from a uniform and homogeneous batch. That is not to say that errors do not occur or that a portion of a particular batch cannot become contaminated or non-representative of the balance of the batch. However, the risk of such an occurrence is insufficient to warrant a rule which would require the State in every case to prove that every ampoule was perfect. Random state police testing of the ampoules available for use at a particular location is sufficient protection against the minor risk of an ampoule which deviates from the required standard.
Further, the testing of 2 ampoules out of a box of 25 ampoules by the state police is only a part of what occurs in practice. Additional ampoules from the same batch may be tested at the same location within a short period of time, or at other breathalyzer locations on many other occasions. Since so many ampoules from one batch may be used throughout the state, it is reasonable to expect that if there is a problem with a particular batch of solution, that fact will probably come to the attention not only of those involved in the administration of the tests but also the prosecution and defense bar through other cases so as to prevent injustice.
Production of the assay certificate should not be a necessary element of proof for the State's introduction of breathalyzer *289 evidence against an accused. It does not provide the link which Dohme II recognizes as logically necessary in the chain of foundation proof. 229 N.J. Super. at 52, 550 A.2d 1232. It is apparent that the link could be supplied by having a representative of the manufacturer appear and testify as to the manufacturing process including the labeling and assignment of batch numbers, or the manufacturer could provide a certification to that effect. However, because those proofs are not yet in place, it is reasonable to establish a rebuttable presumption that the labeling of the ampoules with a single control number was done in conformance with proper manufacturing procedures and standards thereby resulting in a uniform batch. I would hold that additional proof is unnecessary.
NOTES
[1] Laboratory testing does not unequivocally establish, for example, that all ampoules bearing the same batch number are uniform. To this extent, Dohme II's requirement that the assay certificate be produced at trial or referred to in the State Police Coordinator's certifications does not conclusively establish that the population from which the State Police randomly test ampoules is itself uniform and homogeneous in content. Although laboratory testing of samples, at least to some extent, provides additional indicia of reliability, it does not cure the problem noted in Dohme II.
[2] We note that the manufacturer could provide a certification describing the manufacturing process and explaining how the ampoules are labeled and assigned lot numbers. See Evid.R. 63(13). Such a procedure, in addition to practices presently in place, would go far to allay the fear that ampoules assigned the same batch number may not be uniform in composition.