763 A.2d 295 (2000)
335 N.J. Super. 562
BULLET HOLE, INC., a New Jersey Corporation, and Peter Hefferan, Appellants,
v.
Col. Carson DUNBAR, Superintendent, Division of New Jersey State Police; John J. Farmer, Jr., Attorney General of the State of New Jersey; and Christine Todd Whitman, Governor of the State of New Jersey, Respondents.
Superior Court of New Jersey, Appellate Division.
Argued November 14, 2000.
Decided December 20, 2000.
*298 Frank Pisano, III, Montville, argued the cause for appellants (Needleman and Pisano, attorneys; Mr. Pisano, of counsel and on the brief).
Larry R. Etzweiler, Senior Deputy Attorney General, argued the cause for respondents. (John J. Farmer, Jr., Attorney General, attorney for respondents; Nancy Kaplen, Assistant Attorney General, of counsel; Mr. Etzweiler, on the brief).
Before Judges CIANCIA, ALLEY, and LANDAU. *296
*297 The opinion of the court was delivered by ALLEY, J.A.D.
This appeal involves the following issues: (1) whether, by virtue of the New Jersey Constitution's limits on the powers of the Executive Branch, the Governor was precluded from designating the Division of State Police as the agency responsible for conducting background checks under the Brady Act and (2) if the designation was valid, whether certain State Police operating procedures were invalid as having been adopted without the notice and hearing required by the Administrative Procedure Act, N.J.S.A. 52:14B-2(e).

I
We first consider the statutory and regulatory background. In 1993, Congress amended the Gun Control Act of 1968, 18 U.S.C.A. §§ 921-928, by enacting the Brady Handgun Violence Prevention Act ("Brady Act"), Pub.L. 103-159, 107 Stat. 1536 (1993), which is codified in various sections of the Gun Control Act. The Brady Act provisions at issue in this appeal are codified as a note following 18 U.S.C.A. § 922, entitled "national instant criminal background check system." ("NICS")
A key provision bearing on this appeal reads:
(b) Establishment of system. Not later than 60 months after the date of the enactment of this Act, the Attorney General shall establish a national instant criminal background check system that any licensee may contact, by telephone or by other electronic means in addition to the telephone, for information, to be supplied immediately, on whether receipt of a firearm by a prospective transferee would violate section 922 of title 18, United States Code, or State law.

[18 U.S.C.A. § 922 Note.]
Effective November 30, 1998, the end of the sixty-month deadline specified in the Brady Act, the Federal Bureau of Investigation ("FBI") promulgated regulations implementing the NICS. 63 Fed.Reg. 58303. The regulations are codified at 28 C.F.R. § 25.1 to 25.11.[1]
The regulations create a system for background checks of prospective gun purchasers (transferees) by a federal firearms licensee, defined as a person licensed by the federal Bureau of Alcohol, Tobacco, and Firearms ("ATF") as a manufacturer, dealer, or importer of firearms. 28 C.F.R. § 25.2. The licensee may seek such a background check from either the FBI through the FBI NICS Operations Center or, if the *299 state has designated a Point of Contact for the handling of background checks, from a Point of Contact within the state. 28 C.F.R. § 25.6. Each state retains the option of choosing which alternative should govern background checks in that state. 28 C.F.R. § 25.6(a). A "Point of Contact" or "POC" is defined as follows:
POC (Point of Contact) means a state or local law enforcement agency serving as an intermediary between an FFL (federal firearms licensee) and the federal databases checked by the NICS. A POC will receive NICS background check requests from FFLs, check state or local record systems, perform NICS inquiries, determine whether matching records provide information demonstrating that an individual is disqualified from possessing a firearm under Federal or state law, and respond to FFLs with the results of a NICS background check. A POC will be an agency with express or implied authority to perform POC duties pursuant to state statute, regulation, or executive order.

[28 C.F.R. § 25.2. (emphasis added).]
In allowing each state to choose to process background checks either through its own Point of Contact or through the FBI's NICS Operations Center, the FBI perceived that its regulations would avoid the federalism objections that doomed the interim system in Printz, supra, footnote 1, as the FBI explained in its comments to the final version of the regulations. 63 Fed.Reg. 58304-05.
New Jersey has chosen the Point of Contact mechanism, under which a request for a background check is processed as follows:
(d) Access to the NICS through POCs. In states where a POC is designated to process background checks for the NICS, FFLs [federal firearms licensees] will contact the POC to initiate a NICS background check. Both ATF and the POC will notify FFLs in the POC's state of the means by which FFLs can contact the POC. The NICS will provide POCs with electronic access to the system virtually 24 hours each day through the NCIC [National Crime Information Center] communication network. Upon receiving a request for a background check from an FFL, a POC will:
1) Verify the eligibility of the FFL either by verification of the FFL number or an alternative POC-verification system;
(2) Enter a purpose code indicating that the query of the system is for the purpose of performing a NICS background check in connection with the transfer of a firearm; and
(3) Transmit the request for a background check via the NCIC interface to the NICS.
(e) Upon receiving a request for a NICS background check, POCs may also conduct a search of available files in state and local law enforcement and other relevant record systems, and may provide a unique State Assigned Transaction Number (STN) to a valid inquiry for a background check.
(f) When the NICS receives an inquiry from a POC, it will search the relevant databases (i.e., NICS Index, NCIC, III) for any matching record(s) and will provide an electronic response to the POC....

[28 C.F.R. § 25.6(d), (e), & (f).]
Depending on the NICS response, the Point of Contact will give the requesting licensee one of three responses: "Proceed," "Delayed," or "Denied." 28 C.F.R. § 25.6(g)(2); 28 C.F.R. § 25.6(i).
The operating hours for NICS are 9:00 a.m. to 2:00 a.m., seven days per week. 28 C.F.R. § 25.2 (definition of "NICS Operations Center's regular business hours"). But NICS is available twenty-four hours per day for "toll-free electronic dial-up access." 28 C.F.R. § 25.6(b).
In an October 6, 1998, letter to FBI Director Louis J. Freeh, Governor Whitman designated the State Police as New Jersey's Point of Contact. This followed a *300 September 21, 1998, memorandum to Governor Whitman's chief of staff, in which then-Attorney General Peter Verniero recommended that New Jersey choose the Point of Contact option and that the State Police be designated as this State's Point of Contact.
On September 30, 1998, the FBI issued guidelines to the states setting forth standards for Points of Contact and "requirements" and "recommendations" for implementing the Point of Contact system. The guidelines indicate that a Point of Contact must be available for background checks seven days per week, except for Thanksgiving and Christmas, and that a Point of Contact's operational hours "shall be, as a minimum, 10:00 a.m. to 9:00 p.m. Monday through Saturday; and, normal retail business hours within the state on Sundays." Also, the guidelines state that "[t]he FBI will not charge Point of Contact states a fee for accessing the NICS."
The State Police issued Operational Procedures in October 1998 for the processing of NICS background checks through the State Police in its role as a Point of Contact. The procedures declare that the State Police's NICS service will be available by telephone on weekdays, except on state holidays, between 9:00 a.m. and 8:00 p.m. and on Saturdays between 10:00 a.m. and 5:00 p.m. These procedures do not provide for telephone service on Sundays as provided in the FBI Guidelines. Fax service is available every day for twenty-four hours. A $15 charge is made for each telephone or FAX request.
The State Police also adopted a User Agreement, which firearms licensees are required to sign in acknowledgment of having received the Operational Procedures.
On October 28, 1998, the State Police superintendent sent letters to state firearms licensees notifying them of the Point of Contact system and enclosing an instruction package and a User Agreement for their signatures.

II
On November 18, 1998, appellants filed a timely appeal from the Governor's designation of the State Police as the Point of Contact in New Jersey. The notice of appeal named then-Attorney General Verniero and then-State Police Superintendent Williams as respondents. Appellants are Bullet Hole, Inc., a firearms dealership in Belleville, and Peter Hefferan, allegedly a "prospective" firearms purchaser. Each has filed a sworn or certified explanation alleging how each will be harmed by the $15 fee and the above hours of operation of New Jersey's Point of Contact.
In his November 11, 1998 affidavit, Hefferan argued that he was planning to buy several handguns and a rifle in December 1998 and that because of his hours of work, he normally bought firearms at night or on Sundays, times during which NICS access would not be available once the State Police procedures are in place. As a result, he asserts, it will be "extremely difficult, if not impossible" for him to purchase firearms. The $15 fee for NICS access through the State Police, he also claims, is unreasonable, was adopted without due process, and is "outrageous." He asserts that he "will be immediately and irreparably injured if the State Police are allowed to be the New Jersey NICS Point of Contact under the rules promulgated by the State Police in November 1998."
In his undated certification, the owner of Bullet Hole asserted that: Bullet Hole was open from 9:00 a.m. to 9:30 p.m. during the week, from 9:00 a.m. to 5:00 p.m. on Saturdays, and from 12:00 p.m. to 5:00 p.m. on Sundays; that Bullet Hole was planning to expand its facility, which would increase its business "five fold"; that the POC system and procedures adopted by the State Police would restrict Bullet Hole's hours and thereby prevent this expansion and eliminate 40% of Bullet Hole's business; and that Bullet Hole's consignment-sales business would be impaired by the $15 charge, as prospective sellers will go to out-of-state *301 dealers. Bullet Hole contends that "[m]any of the Bullet Hole, Inc. customers are blue collar workers who work in shifts. Often, the only time these individuals have to shop for firearms and related equipment is on Sundays. Additionally many of the Bullet Hole, Inc. customers shop in the later evening hours after work and having dinner with their families. The loss of these prospective customers will cause the Bullet Hole, Inc. to suffer immediate and irreparable harm."
In December 1998, we denied appellants' motion to stay the State Police's procedures. In March 1999 appellants amended their notice of appeal to include Governor Whitman as a respondent.

III
We first address the appealability of the Governor's designation. Respondents do not contest its appealability. R. 2:2-3(a)(2) does not expressly authorize appeals from such actions by a Governor, but in our view the rule encompasses those actions under the rubric of "actions of any state administrative agency or officer," inasmuch as the Governor is indisputably the State's chief executive or "administrative officer." Cf. New Jersey Builders Ass'n v. Byrne, 80 N.J. 469, 471, 404 A.2d 32 (1979) (accepting without discussion an appeal from a Governor's executive order); Dalton v. Kean, 213 N.J.Super. 572, 574, 517 A.2d 1224 (App.Div.1986), certif. denied, 107 N.J. 110, 526 A.2d 181 (1987) (accepting without discussion an appeal from a Governor's Reorganization Plan dismantling the Department of Energy). We conclude that the Governor's designation was appealable and that we have jurisdiction.

IV
Appellants contend that New Jersey's adoption and implementation of the Point of Contact system for processing Brady Act background checks violate the separation-of-powers clause of the State Constitution. They assert that (1) the Governor encroached on the legislative sphere when she purported to regulate firearms by designating a state agency as a Point of Contact and by allocating state resources for that purpose; and (2) the Attorney General and State Police promulgated Point of Contact "regulations" without any enabling state legislation.
The authority of the Governor of New Jersey derives from Article V of the State Constitution. "The executive power shall be vested in a Governor." N.J. Const. art. V, § 1, ¶ 1. The Governor supervises each executive department and its head, including the Attorney General. N.J. Const. art. V, § 4, ¶ 2. The Governor is responsible for enforcing the laws of the State:
The Governor shall take care that the laws be faithfully executed. To this end he shall have power, by appropriate action or proceeding in the courts brought in the name of the State, to enforce compliance with any constitutional or legislative mandate, or to restrain violation of any constitutional or legislative power or duty, by any officer, department or agency of the State; but this power shall not be construed to authorize any action or proceeding against the Legislature.

[N.J. Const. art. V, § 1, ¶ 11.]
The framers of the 1947 Constitution intended to create a "strong executive." Kenny v. Byrne, 144 N.J.Super. 243, 251, 365 A.2d 211 (App.Div.1976), aff'd o.b., 75 N.J. 458, 383 A.2d 428 (1978). One commentator has concluded that "[t]he Governor of New Jersey is, at least functionally, the most powerful Chief State Executive in the nation." Jack M. Sabatino, Assertion and Self Restraint: The Exercise of Governmental Powers Distributed Under the 1947 New Jersey Constitution, 29 Rutgers L.J. 799, 825 (1998). Thus the "terse comprehensive" grant of power in the Constitution "must be given life and meaning by investing him with the authority to implement his responsibilities." *302 Kenny, supra, 144 N.J.Super. at 251, 365 A.2d 211.
The Constitution has also reserved powers for the Legislature, for example, the power to appropriate money from the state treasury. N.J. Const. art. VIII, § 2, ¶2; Communications Workers of America v. Florio, 130 N.J. 439, 451, 617 A.2d 223 (1992).
Neither the Governor nor the Legislature may encroach on the powers of the other because:
The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.

[N.J. Const. art. III, ¶ 1.]
The separation of powers prevents any one branch from aggregating unchecked power, which might lead to oppression and despotism. Worthington v. Fauver, 88 N.J. 183, 206, 440 A.2d 1128 (1982). Nonetheless, it is not to be applied in such a way as "to restrict the legitimate operation of representative democracy." Ibid. The Supreme Court has cautioned against treating the branches as watertight compartments. State v. Loftin, 157 N.J. 253, 284, 724 A.2d 129, cert. denied, 528 U.S. 897, 120 S.Ct. 229, 145 L.Ed.2d 193 (1999); In re Salaries for Probation Officers of Bergen County, 58 N.J. 422, 425, 278 A.2d 417 (1971). Rather, the doctrine should be flexibly interpreted to encourage a "cooperative accommodation among the three branches," Communications Workers, supra, 130 N.J. at 449, 617 A.2d 223, and their powers should be viewed as being "complementary." Knight v. Margate, 86 N.J. 374, 389, 431 A.2d 833 (1981). Only when the challenged action impairs "the essential integrity" of another branch will a court step in to enforce the constitutional boundaries. Cupano v. Gluck, 133 N.J. 225, 233, 627 A.2d 624 (1993) (quoting Massett Building Co. v. Bennett, 4 N.J. 53, 57, 71 A.2d 327 (1950)). See also, Sabatino, supra, 29 Rutgers L.J. at 822-23.
Appellants in this case have cited no New Jersey case, and we have found none, in which a court has overturned a Governor's action as violating the constitutional separation between the executive and legislative branches. Appellants insist that we should do so here, because "firearms regulation is the exclusive responsibility of the Legislature," pointing to the Legislature's enactment of the gun-possession provisions of the criminal code (N.J.S.A. 2C:39-1 to -16) and of the firearms-licensing law (N.J.S.A. 2C:58-1 to -18). They further invoke the Supreme Court's comment that "the subject of gun control is a comprehensive one that is almost invariably resolved on the basis of legislative intention." In re Preis, 118 N.J. 564, 574, 573 A.2d 148 (1990).
Not only may the Governor not take any action to regulate guns, appellants continue, but in addition she may not commit funds to that effort, which they submit would infringe on the Legislature's exclusive power to appropriate money. This contention is based on an assumed premise: "It is assumed that in addition to the $15.00 fee for access to the New Jersey POC [Point of Contact], additional state monies are financing the overhead for the operation of the POC." But there is nothing in the record concerning the added costs, if any, of the Point of Contact system.
Respondents do not dispute that the regulation of gun sales lies squarely within the "legislative power," N.J. Const. art. IV, § 1, ¶ 1. It does not follow, however, that the Governor may take no action in that area. Indeed, the Governor is required, by virtue of her duty to execute the laws, to take many kinds of actions to enforce legislation, whether by delegating enforcement duties to the Attorney General, by issuing executive orders, or by exercising whatever powers are reasonably implied *303 and necessary to fulfill her constitutional duties. Worthington v. Fauver, 180 N.J.Super. 368, 375-76, 434 A.2d 1134 (App.Div.1981), aff'd, 88 N.J. 183, 440 A.2d 1128 (1982); Kenny, supra, 144 N.J.Super. at 250-52, 365 A.2d 211.
When, as here, the Governor purports to be acting consistently with express or implied authority from the Legislature, she "exercises not only [her] own powers but those delegated by the legislature." Worthington, supra, 180 N.J.Super. at 376, 434 A.2d 1134. Her action should be "supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." Ibid. (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153, 1200 (1952)).
Among the laws the Governor has the duty to enforce is a provision of the act governing the State Police, N.J.S.A. 53:1-20.6(a):
The Superintendent of State Police, with the approval of the Attorney General, shall, pursuant to the "Administrative Procedure Act," P.L.1968, c. 410 (C. 52:14B-1 et seq.), adopt rules and regulations authorizing the dissemination, by the State Bureau of Identification, of criminal history record background information requested by State, county and local government agencies, including the Division of State Police, in noncriminal matters, or requested by individuals, nongovernmental entities or other governmental entities whose access to such criminal history record background information is not prohibited by law. A fee not to exceed $25 shall be imposed for processing fingerprint identification checks; a fee not to exceed $15 shall be imposed for processing criminal history name search identification checks. These fees shall be in addition to any other fees required by law. In addition to any fee specified herein, a nonrefundable fee, the amount of which shall be determined by the Superintendent of State Police, with the approval of the Attorney General, shall be collected to cover the cost of securing and processing a federal criminal records check for each applicant.
As authorized by this section, the State Police have adopted regulations governing criminal background checks for non-criminal matters, such as hiring and licensing. N.J.A.C. 13:59-1.1 to -1.6. Only "authorized requesters" may obtain criminal history data. N.J.A.C. 13:59-1.6. That category includes
any person, agency or entity, including national requesters, authorized by Federal or State statute, rule or regulation, executive order, administrative code, local ordinance, resolution or by this chapter, to obtain dissemination of Criminal History Record Information accessed from the computerized databases of the New Jersey Criminal Justice Information System, the National Law Enforcement Telecommunications System (NLETS) or other states' computerized repositories containing criminal history record information for non-criminal justice purposes, including licensing and/or employment.

[N.J.A.C. 13:59-1.1.]
The regulations further permit the State Police to release information to special categories of requesters not pertinent here, and also direct the State Police to comply with "any other Federal or State laws, regulations, executive orders, ordinances or resolutions authorizing the dissemination of criminal history record information." N.J.A.C. 13:59-1.2(a).
Respondents contend that licensed firearms dealers are "authorized requesters" within the meaning of N.J.A.C. 13:59-1 .1, in that they are authorized by the Brady Act and regulations to request a background check on prospective purchasers. They submit that the Governor's designation of the State Police as the Point of Contact for Brady Act purposes "is fully *304 consistent with N.J.S.A. 53:1-20.6(a) and with the regulations promulgated under this statute."
Though not cited by respondents, another section of the State Police law, while not directly addressed to background checks, evidences the Legislature's intention that the State Police cooperate with the FBI and other law enforcement agencies:
The supervisor of the state bureau of identification shall cooperate with the bureaus in other states and with the bureau in the department of justice of the United States and shall develop and carry on an interstate, national and international system of identification within the requirements of the state bureau of identification.

[N.J.S.A. 53:1-19.]
A further source cited by respondents for the Governor's authority to designate the State Police as the Point of Contact is the firearms-licensing statute, N.J.S.A. 2C:58-1 to -18. Throughout that statute the Legislature invested the superintendent of the State Police with the authority to administer the system for registering dealers and processing permits to purchase and carry guns. N.J.S.A. 2C:58-1 to -4.
In his September 21, 1998, memorandum recommending that the State Police be designated as a Point of Contact, then-Attorney General Verniero referred to the goal of fostering New Jersey's own gun laws:
If New Jersey does not participate, there is the potential for individuals who have been disqualified and prohibited from purchasing firearms in New Jersey to go undetected, thereby circumventing our New Jersey firearm laws. This situation will occur because the FBI does not have access to all of the various State systems available to the State Police such as Administrative Office of the Courts Domestic Violence Central Registry Protection Order File, State Police Firearms Denied Person File, all New Jersey Non Felony Convictions, and all Pending Arrests. Designation of the State Police as the point of contact for the federally required NICS check will enhance the ability of the State to enforce its firearm laws by identifying individuals who may have become disqualified from purchasing firearms subsequent to the issuance of a firearm purchaser identification card or permit to purchase a handgun.
Governor Whitman cited that purpose in her designation letter: "This participation will enable New Jersey to support this federal initiative while also enhancing our ability to enforce existing State Firearm laws more effectively."
Governor Whitman's Point of Contact designation letter is similar to an executive order, a well-accepted tool of gubernatorial action notwithstanding the absence of any express constitutional authority for such a tool. And the Brady Act's invitation to the states to designate a Point of Contact arguably is similar to federal statutory authorizations of executive orders, which also have gone unchallenged. For example, many executive orders from New Jersey Governors have been authorized by federal law, either by requiring a state to act or by allowing discretionary action. Michael S. Herman, Gubernatorial Executive Orders, 30 Rutgers L.J. 987, 1004 (1999). In the latter circumstance (authorizations of discretionary action), "the authorizing federal law does not really remove power from the state, but merely enables the states to take advantage of a program if they wish." Ibid.[2]
*305 We are satisfied that the Governor's Point of Contact designation was an appropriate exercise of the authority and powers of her office and did not violate the Legislature's "essential integrity." Indeed, those actions complemented, and did not contradict, the Legislature's existing authorization of background checks for gun purchasers and of the State Police's role in that process.

V
In addition to their separation-of-powers challenge to the Governor's designation and the State Police's procedures, appellants contend in the alternative that two of the State Police's Operational Procedures qualified as "rules" that were subject to the notice and hearing requirements of the Administrative Procedure Act.
The Operational Procedures set forth detailed mechanisms for Brady Act background checks via the State Police as Point of Contact. Because appellants specifically protest just two of the procedures, we limit our consideration of appellants' objections to those two: (1) the $15 fee for each request, and (2) the hours during which dealers may call for background checks (9:00 a.m. to 8:00 p.m. on weekdays, 10:00 a.m. to 5:00 p.m. on Saturdays, and not at all on state holidays or on Sundays).
[10] It is undisputed that the State Police is an "agency" to which the Administrative Procedure Act applies. N.J.S.A. 52:14B-2. Hence, the State Police may not adopt "rules" without first satisfying the notice and hearing steps of the Administrative Procedure Act, see State v. Garthe, 145 N.J. 1, 7, 678 A.2d 153 (1996). We thus must determine whether the two challenged Operational Procedures indeed are "rules," or instead are some lesser or other kind of agency action to which the Administrative Procedure Act rulemaking process does not apply.
The governing provision of Administrative Procedure Act is N.J.S.A. 52:14B-2(e):
(e) "Administrative rule" or "rule," when not otherwise modified, means each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include:
(1) statements concerning the internal management or discipline of any agency;
(2) intra agency and interagency statements; and (3) agency decisions and findings in contested cases.
The standards for determining whether an agency decision or other activity is governed by the rulemaking strictures were articulated in Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 478 A.2d 742 (1984). An agency's action may be classified as a "rule"
if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory *306 policy in the nature of the interpretation of law or general policy.

[Id. at 331-32, 478 A.2d 742.]
The Court in Metromedia propounded this six-part test as a way to decide whether the action there at issue was a "rule" or an "adjudication," the latter being exempt from rulemaking by virtue of N.J.S.A. 52:14B-2(e)(3). But the Court has acknowledged that the test may appropriately be used to decide whether any kind of agency action (e.g., orders, guidelines, directives) must be accompanied by formal rulemaking. Doe v. Poritz, 142 N.J. 1, 97, 662 A.2d 367 (1995); Woodland Private Study Group v. State, 109 N.J. 62, 67-68, 533 A.2d 387 (1987). Moreover, "not all of these factors need be present in order for agency action to constitute a rule. Rather, the various factors can be balanced even if some are present and others are not." Woodland, supra, 109 N.J. at 66, 533 A.2d 387.
The two protested provisions appear in the "FORWARD [sic]" to the Operational Procedures, which in their complete context read as follows:

The NICS will be available telephonically weekdays from 9:00 a.m. to 8:00 p.m. and Saturday from 10:00 a.m. to 5:00 p.m. (except state holidays). In the future, the NICS Center reserves the right to expand the hours of telephonic coverage based upon operational experiences. A facsimile service will be available twenty four (24) hours a day, seven (7) days a week. A charge of $15 will be incurred for each telephone transaction or facsimile. Only one transaction per telephone call or facsimile will be permitted. The NICS will not accept batched telephone calls or facsimiles [emphasis in original]. A typical telephonic NICS transaction will take two (2) to three (3) minutes. Facsimile requests will be answered within three (3) business days (exclusive of the day on which the inquiry was made).
Appellants contend that these two clauses meet four of the Metromedia criteria and thus must be treated as "rules." First, they claim, the clauses govern "a large segment of the regulated or general public, rather than an individual or a narrow select group" (the first Metromedia factor). Appellants assert:
Certainly, anyone subject to regulations regarding the transfer of firearms in the State of New Jersey will be effected [sic] by the above described action of the Division of State Police and/or the Attorney General. All SFLs [State Firearms Licensees] in New Jersey will have had their potential hours of operation curtailed by the above described directive of the Division. Likewise, the Division of State Police's and/or Attorney General's above described actions will effect [sic] all prospective firearms transferees by limiting the time when they may purchase firearms and by imposing an additional $15 fee for access to the NICS.
Second, the two provisions, appellants argue, are "intended to be applied generally and uniformly to all similarly situated persons" (the second Metromedia factor). Thus, they point out, all licensed sellers must contact NICS through the State Police, and every prospective purchaser must pay the $15 fee before the purchase can be approved.
Third, appellants contend that the two restrictions prescribe a legal standard or directive that is not otherwise expressed in or inferable from the enabling statutory authorization (the fourth Metromedia factor). They argue:
In fact, the restriction of the SFL's hours of operation and imposition of a $15 fee for access to NICS has no authority express or otherwise, under N.J.S.A. 2C:58-1, et seq. On the contrary, N.J.S.A. 2C:58-3f expressly states that there shall be no additions or requirements required by the licensing authority for the issuance of a permit or identification card, other than those specifically set forth in that chapter. It was *307 the express intent of the Legislature when setting up its "careful grid" of regulatory provisions regarding New Jersey gun control laws that only the Legislature is to have the power to regulate the licensing and purchase of firearms.
Fourth and last, appellants maintain that the two clauses reflect an "administrative policy ... not previously expressed in any official and explicit agency determination, adjudication or rule" (part of the fifth Metromedia factor). They reason that before these procedures were adopted, the State Police "followed only those rules set forth" in the firearms-licensing statute and State Police law, and that the Operational Procedures represent "the first time that the Governor, Division and/or Attorney General has attempted to supplement the `careful grid' of regulatory provisions found in N.J.S.A. 2C:58-1, et seq., absent expressed legislative authority to do so."
Based on these principles, we conclude that the Administrative Procedure Act was not violated by the implementation of the $15 fee, but that it was violated by the adoption of the New Jersey Point of Contact operating hours.

A
With respect to the $15 fee, respondents counter that the fee was authorized by a preexisting statute and regulation, and hence need not have been formally promulgated again under the Administrative Procedure Act. They cite the section of the State Police statute that authorizes the State Police to charge $15 "for processing criminal history name search identification checks." N.J.S.A. 53:1-20.6(a). And they note that a regulation implementing that statute had already been adopted: N.J.A.C. 13:59-1.3(b) ("A fee of $15 shall be collected by the [State Bureau of Investigation] for the purpose of processing criminal history name search identification checks"). Thus, respondents reason, "the Division of State Police has already promulgated the rule which appellants demand" (Rb27).
Appellants assert, however, that the fee allowed by N.J.A.C. 13:59-1.3(b) is not for the same kind of information sought by Brady Act requests. While the latter regulation concerns a fee for "criminal history name search" data, a Brady Act search does not result in disclosure of that sort of data. Appellants state,
[W]hen a retailer contacts the POC, no criminal history name search information is disseminated.
When accessing the POC, the retailer never receives any information beyond one of three possible responses: "approved," "denied," or "pending." The retailer is not apprised of the prospective transferee's criminal history; therefore, the statute and code provisions regarding criminal history "dissemination" do not apply to situations when a retailer contacts the POC for approval of a sale.
"Criminal history name search" is not defined in the fee regulation, N.J.A.C. 13:59-1.3(b), or anywhere else in the regulations governing State Bureau of Investigation background checks. The kind of information accessed seems to be essentially the same as in a Brady Act NICS check, although the information given back in response, a simple "approved-denied-pending," is much less comprehensive in the case of NICS searches. Thus, N.J.A.C. 13:59-1.1. describes the pertinent data ("criminal history record information") as "consisting of identifiable descriptions and notations of arrests, indictments, or other formal criminal charges, and any dispositions arising therefrom, including convictions, dismissals, acquittals, sentencing, correctional supervision and release."
We conclude that, assuming that the imposition of the fee is a "rule," no rulemaking procedures were necessary under the Administrative Procedure Act because the existing regulation "for the purpose of processing criminal history *308 name search identification checks," N.J.A.C. 13:59-1.3(b), is sufficiently broad to encompass authority to charge the same fee for NICS checks. We acknowledge that the purpose of the search, as well as the information received, are not identical in the case of an NICS search and a search under N.J.S.A. 53:1-20.6(a). But they are sufficiently similar that the authority under N.J.A.C. 13:59-1.3(b) should be deemed to encompass both. No useful purpose would be served in compelling the State Police to adopt a separate rule for the $15 NICS fee, assuming a rule were required, when a $15 charge is already authorized by the existing regulation for a similar purpose.
In the alternative, if the existing regulation does not authorize the $15 fee for NICS searches, we also consider whether the $15 NICS search fee is, without more, to be considered as a "rule," subject to the rulemaking procedures of the Administrative Procedure Act. Counsel have not referred us to, nor has our own research disclosed, any cases in which the charging of a fee has been held to constitute a rule, as to which the agency is required by the Administrative Procedure Act to engage in rulemaking in order for the fees and hours to be effective.
We note that many characteristics that might typically be associated with administrative rules are not present in the case of the $15 fee. Thus, the fee does not proscribe conduct by members of the public generally or by members of a specific group being regulated,[3] nor does it prescribe conduct.[4]
The fee does not direct the taking of actions or proceedings by the agency,[5] nor does it have the purpose of describing or implementing substantive agency policy.[6] The fee likewise does not embody a detailed set of procedures or eligibility requirements.[7]
Manifestly, as well, the specifics concerning the fee are not inordinately difficult for the public to discover, even if not published in the New Jersey Administrative Code, and are probably well known to every retail firearms seller in New Jersey. To be sure, some administrative details respecting fees have been promulgated at least occasionally in the New Jersey Administrative *309 Code,[8] but that does not answer the inquiry as to whether the adoption of the particular fee presented on this appeal constitutes rulemaking. Furthermore, the fee, without more, does not seem to us to be a "rule" as the term is employed in N.J.S.A. 52:14B-3, which reads:
In addition to other rule-making requirements imposed by law, each agency shall:
(1) adopt as a rule a description of its organization, stating the general course and method of its operations and the methods whereby the public may obtain information or make submissions or requests....
In the absence of more direct or specific authority, the Metromedia factors outlined above and the Supreme Court cases that have considered them are the best available decisional guideposts. We are satisfied that the first and second Metromedia factors are present. We reject the contention by appellants that Metromedia factors four, prescribing legal standards or directives not otherwise expressed in or inferable from the enabling statutory authorization, and five, an "administrative policy... not previously expressed in any official and explicit agency determination, adjudication or rule," are germane in the present analysis when the issue is whether implementation of the $15 fee, without more, constitutes an exercise in rulemaking within the meaning of the Administrative Procedure Act.
Among the cases that have applied Metromedia is Doe v. Poritz, supra, 142 N.J. at 96-99, 662 A.2d 367, where the Supreme Court concluded that the Attorney General's "Guidelines" for community notification under Megan's Law, N.J.S.A. 2C:7-1, et seq., were not administrative rules within the meaning of the Administrative Procedure Act. The Court noted with respect to Metromedia:
Although in Metromedia we were concerned about the distinction between rulemaking and adjudication, the factors are relevant whenever the authority of an agency to act without conforming to the formal rulemaking requirements is questioned. Woodland Private Study Group, supra, 109 N.J. at 67, 533 A.2d 387. The factors need not be given the same weight, and some factors will clearly be more relevant in a given situation than others: "All six of the Metromedia factors need not be present to characterize agency action as rulemaking, and the factors should not merely be tabulated, but weighed." In re Solid Waste Util. Customer Lists, supra, 106 N.J. [508] at 518, 524 A.2d 386.

[142 N.J. 1, at 97, 662 A.2d 367.]
In determining that the Guidelines's promulgation did not constitute administrative rule-making, the Court relied in part on these circumstances: "... the Guidelines were prepared in response to a specific statutory mandate and their contents are largely dictated either explicitly or implicitly by the language of the statute." Id. at 98-99, 662 A.2d 367. This was in contrast with the facts presented in Metromedia, supra, where "the determination was not otherwise expressly provided for by the statute, nor was it clearly and obviously implied." 97 N.J. at 330, 478 A.2d 742.
In State v. Garthe, supra, 145 N.J. 1, 678 A.2d 153, the Supreme Court held that the action of the State Police in setting forth procedures to test breathalyzer machines did not constitute rule-making to which the requirements of the Administrative Procedure Act applied. The Court observed,
Obviously, not every action of a State agency, including informal action, is subject to the formal notice and comment requirements of N.J.S.A. 52:14B-4. In making this qualitative determination, *310 we have generally considered: (1) the segment of the public to be affected by the administrative action; (2) the generality of application of the agency action; (3) the prospectiveness of the result; and (4) the novelty of any legal standard announced. George Harms Constr. Co. v. New Jersey Turnpike Auth., 137 N.J. 8, 18, 644 A.2d 76 (1994).

[145 N.J. 1, at 7, 678 A.2d 153.]
Moreover, as the Court stated in Metromedia, "... when the agency action is concerned with "broad policy issues" that affect a large segment of the regulated or general public, rule-making as such is implicated." Metromedia, supra, 97 N.J. at 330, 478 A.2d 742.
We thus conclude, in the alternative, that the $15 fee is not a "rule" under the Metromedia test. As has been shown, it does not bear the characteristics of many administrative rules. The fee does not prescribe conduct or standards on the part of the public or the State Police. It neither implements nor embodies substantive policy. In addition, for persons who wish to engage in transactions respecting expensive merchandise, it is not a manifestly prohibitive charge, or one that would have the clear effect of limiting their participation in those activities. Moreover, the institution or non-institution of the fee requirement for NICS checks is not a matter of such public moment that the formal procedures of the rulemaking process are necessary in order to protect citizens from arbitrary or uninformed agency action.
Accordingly, there is no merit to appellants' objection to the $15 fee for NICS searches, for each of the alternative reasons we have expressed.

B
Our conclusion with respect to the Point of Contact operating hours is different, for we are persuaded, in the particular circumstances this appeal presents, that their adoption constituted the adoption of a
"rule" within the meaning of N.J.S.A. 52:14B-2(e), the relevant section of the Administrative Procedure Act, quoted above.
In our view, the mere adoption by an agency of hours of operation to serve the public does not in and of itself necessarily constitute rulemaking, for many of the same reasons the $15 fee does not. In the context of the particular facts presented by this appeal, however, the actual State Police Point of Contact operating hours that have been adopted can and should be distinguished. In at least two significant post-Metromedia decisions that considered what did or did not constitute rulemaking by an agency, the Supreme Court gave weight to the similarity of the administrative action in question to an authorizing statute or other authorizing source. Thus, in Doe v. Poritz, supra, 142 N.J. at 97-98, 662 A.2d 367, with respect to the conformity of the Attorney General's Megan's Law community notification Guidelines to the statutory source, the Supreme Court stated:
The Guidelines are to a great extent merely a formalization of the classification requirements explicitly set forth in the statute. To the extent that the classification criteria, or any other requirements of the Guidelines, deviate substantially from the explicit or implied standards of the statute, those aspects of the Guidelines are subject to judicial review, see, e.g., A.A. Mastrangelo, Inc. v. Department of Envtl. Protection, 90 N.J. 666, 449 A.2d 516 (1982), as well as review by the Legislature, N.J. Const. art. V, § 4, ¶ 6. We have, in this opinion, required revisions to the Guidelines which would tailor them more closely to the statutory language. See supra at 34-38. Therefore, the fourth factor, and the one we believe to be the most important of the six Metromedia factors in this instance, is not satisfied.
And in State v. Garthe, supra, 145 N.J. at 7, 678 A.2d 153, the Supreme Court *311 stated with respect to the State Police breathalyzer test procedures:
Nor do we view those test procedures as setting forth "a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization." Metromedia, supra, 97 N.J. at 331, 478 A.2d 742. The legal standards and directives for testing breathalyzers stem from this Court's decision in Romano v. Kimmelman, supra [96 N.J. 66, 79-80, 474 A.2d 1 (1984)], that the machine must be in "proper working order" at the time of the test. 96 N.J. at 82, 474 A.2d 1. We are informed that the test procedures were derived from the manufacturer's recommendations. A number of prior decisions had referred to the standards and procedures used to test breathalyzer machines. E.g., State v. Maure, 240 N.J.Super. 269, 573 A.2d 186 (App.Div. 1990), aff'd, 123 N.J. 457, 588 A.2d 383 (1991); State v. Slinger, 281 N.J.Super. 538, 658 A.2d 1299 (App.Div.1995).
By contrast to Doe v. Poritz and Garthe, the State Police Point of Contact operating hours differ significantly from the hours set forth in the originating or source measure, namely, the FBI guidelines. Appellants assert that by virtue of the State Police not allowing as much Point of Contact access as the FBI guidelines (Sunday hours, hours on most state holidays, and longer hours on other days), the rights of the gun-buying public are severely curtailed. We do not now determine that the New Jersey Point of Contact hours must be identical to the hours recommended by the FBI. Nevertheless, we are satisfied that the departure from the FBI-recommended standard strongly implicates the intent if not the literal language of Metromedia factors four and five ("(4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from enabling statutory authorization; (5) reflects administrative policy that (i) was not previously expressed in official and explicit agency determination, adjudication or rule...") and that the members of the public have a legitimate interest is being able to state their objections to or support for those hours through the means of the Administrative Procedure Act's rulemaking process. Accordingly, Metromedia factors one, two, four, and five are present, and in the circumstances of this appeal it is evident that the hours of operation for the Point of Contact services in New Jersey should have been considered in a formal rulemaking proceeding.
Given the deviation of the New Jersey Point of Contact hours from the FBI guidelines, we find no merit in respondents' suggestion that the hours-of-operation provision is not an Administrative Procedure Act "rule" because operating hours concern "the internal management" of an agency and thus are statutorily exempt. N.J.S.A. 52:14B-2(e)(1) (exempting "statements concerning the internal management or discipline of any agency"). Respondents argue that an agency should not have "to promulgate a rule whenever it wishes to offer hours of operation above and beyond the normal 40-hour workweek." Such a mandate, they say, would impair the State Police's ability to "respond to changing law-enforcement conditions." We are satisfied, however, that the hours of Point of Contact accessibility do not concern "internal management." Rather, they represent the Point of Contact's interface with the public, and they meet the Administrative Procedure Act's definition of a "rule," in that it is an "agency statement of general applicability and continuing effect that implements" law, namely, the Brady Act, as administered by the designated administrative authority in this State.
We are mindful of the need to maintain flexibility and responsiveness in the policies and actions of administrative agencies, including the State Police, and we do not reach our conclusions out of a blind desire to impose an inflexible reign of red tape *312 and restrictive procedures to the detriment of that need. But the hours of operations involved here have an impact beyond the internal workings of the State Police. They have a clear effect on the public and represent a significant departure from the hours of operation recommended by the FBI.
As stated, we do not now rule that the State Police must adopt the same hours as those recommended by the FBI, nor do we hold that the State Police are free to reject those hours. All we determine in this opinion about the Point of Contact operating hours is that the State Police should forthwith institute rulemaking proceedings in accordance with the Administrative Procedure Act to adopt appropriate hours for Brady Act NICS checks. In order to avoid sudden disruption respecting those operations we stay the operation of this portion of our order and determination for a period of 120 days.

VI
To summarize, we conclude that the Governor had the constitutional power to designate the State Police as New Jersey's Point of Contact for Brady Act background checks, and appellants' appeal with respect thereto is without merit. We further conclude that the institution of the $15 fee for NICS checks did not constitute the adoption of a "rule" without conformity to the procedures of the Administrative Procedure Act, and appellants' appeal with respect thereto is likewise rejected. We conclude, however, that the State Police's Point of Contact operating hours should have been the subject of the Administrative Procedure Act's rulemaking procedures, and that the present hours are invalid because they were not so adopted.
Accordingly, appellants' appeal contesting the Governor's designation of the State Police as the Point of Contact is denied, as is their appeal contesting the $15 fee. We conclude that the New Jersey Point of Contact operating hours are invalid as being adopted in violation of the Administrative Procedure Act, but as to that aspect of our determination that we stay the effect of this order for 120 days.
NOTES
[1] As an interim measure, pending creation by the Attorney General of the United States of the mandated national instant criminal background check system ("NICS"), the Brady Act set up a system requiring state officials to administer the act. That interim feature was declared unconstitutional, as violative of sovereignty of the states, in Printz v. United States, 521 U.S. 898, 933-35, 117 S.Ct. 2365, 2383-84, 138 L.Ed.2d 914, 943-45 (1997).

The interim system is not at issue in this appeal, which instead concerns the permanent NICS system. (In her concurring opinion in Printz, Justice O'Connor acknowledged that, in spite of the majority's holding, "[s]tates and chief law enforcement officers may voluntarily continue to participate in the federal program." 521 U.S. at 936, 117 S.Ct. at 2385, 138 L.Ed.2d at 945 (O'Connor, J., concurring)).
[2] In executive orders issued earlier in her tenure, Governor Whitman has implemented federal requirements that she designate state officials or agencies to carry out the requirements of federal laws and regulations. Id. at 1005 n. 97, 1006 n. 105. For example, a section of the Oil Pollution Act of 1990, 33 U.S.C.A. § 2706(b)(3), mandates that "[t]he Governor of each State shall designate State and local officials who may act on behalf of the public as trustee for natural resources under the Act." In a 1994 executive order Governor Whitman designated the Commissioner of the Department of Environmental Protection as the state official contemplated by the federal act. Whitman Exec. Order No. 23, 26 N.J.R. 4123 (Oct. 17, 1994).
[3] See, illustratively, Board of Psychological Examiners regulation at N.J.A.C. 13:42-10.9(a):

A licensee shall not participate in a sexual relationship or engage in sexual intimacies with a current psychotherapy client, a former client to whom psychotherapy was rendered within the immediately preceding 24 months, a current student, a direct supervisee or supervisor, or a research participant....
[4] See, illustratively, State Board of Professional Planners regulation at N.J.A.C. 13:41-1.1:

Every licensed professional planner shall obtain a seal containing the planner's name, licensee number and the legend "licensed professional planner" in the design authorized by the Board.
[5] See, illustratively, New Jersey Cemetery Board regulation at N.J.A.C. 13:44J-4.3:

(a) The Board shall elect the following officers from among its members annually at the first Board meeting of each calendar year, which officers shall execute the following duties....
[6] See, illustratively, Board of Psychological Examiners regulation at N.J.A.C. 13:42-11.1:

(a) This subchapter implements the provisions of P.L.1985, c. 256 (N.J.S.A. 45:14B-31 et seq.), which limits the scope of and establishes procedures by which clients may authorize licensees to disclose confidential information upon the request of an insurer or other third-party payor.
[7] See, illustratively, State Board of Shorthand Reporting regulation at N.J.A.C. 13:43-2.1, "Eligibility for certification as a certified shorthand reporter," prescribing numerous requirements for such certification, which include such proficiency requirements as:

4 ... a certification from a school of shorthand reporting approved by the Board stating that the applicant has successfully completed a qualifying test which meets the following criteria: i. Total word count shall consist of 1,125 words dictated by four individuals at 225 words per minute....
[8] See, illustratively, N.J.A.C. 13:41-3.2:

(a) The fees charged by the State Board of Professional Planners shall be: [comprehensive fee schedule includes] 9. Duplicate Wall Certificate.... $25 ....