765 A.2d 286 (2001)
336 N.J. Super. 520
Carl K. HAMPTON, Petitioner-Appellant,
v.
DEPARTMENT OF CORRECTIONS, Respondent-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted January 9, 2001.
Decided February 1, 2001.
*288 Carl K. Hampton, appellant pro se.
John J. Farmer, Jr., Attorney General, for respondent (Michael J. Haas, Assistant Attorney General, of counsel; Jeffrey K. Gladden, Deputy Attorney General, on the brief).
Before Judges PRESSLER, KESTIN and BILDER.
*287 The opinion of the court was delivered by KESTIN, J.A.D.
Carl K. Hampton, an inmate in the Southern State Correctional Facility serving a nine-year sentence, appeals from final agency decisions of the Department of Corrections (Department) classifying him for the purpose of assigning the appropriate level of custody at the time he was received into the system to serve his current sentence and thereafter. The current sentence was imposed on October 23, 1998. The crime had occurred in April 1989, but in the intervening period Hampton was serving sentences in other states.
Hampton was initially classified by the standards of the Department's "Objective Classification Scoring Process" as requiring "medium custody" with involvement in a drug rehabilitation program. Later, he became subject to an "override" contained in the Department's "Substance Abuse Treatment Policy and Procedures" pursuant to which he was designated as requiring special treatment, medical/psychological.
Hampton raises two arguments on appeal. He contends that the classification standards at issue were applied to him unfairly and in violation of the bar in N.J. Const. art. IV, § 7, ¶ 3 against ex post facto laws. He also argues that the classification standards were not properly adopted and implemented in accordance with the requirements of the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -12.
The challenged standards are contained in two related Department policy statements. One, issued on November 4, 1994 and revised on January 6, 1999, has to do with an "objective classification scoring processinitial instrument"; and the other, issued on September 1, 1998 in a memorandum from the Commissioner of Corrections (Commissioner), has the stated purpose of "address[ing] the drug-driven crime problem by identifying chronic substance-abuse dependent offenders and to expand treatment services to help ensure sustained recovery." Both policy statements embody criteria, definitions, and procedures affecting the inmate classification process. The first establishes methods and means for classifying inmates in accordance with the process codified at *289 N.J.A.C. 10A:9-1.1 to -8.12. It includes an objective scoring system for determining the appropriate level of custody for an inmate, as well as a series of overrides to the objective classification system for application in prescribed circumstances. The second policy statement deals with specific issues having to do with drug dependency and treatment, especially with the impact of those issues upon classification and the process of implementing some of the "overrides" to the objective classification standards.
Hampton's classification resulted from the application of the objective criteria and one of the overrides reflecting that Hampton had signed out of a drug treatment program against the advice of staff. He was informed that the override could be removed if he returned to the treatment program.
Our review of the challenged policies and the standards at issue in the light of applicable legal principles and the record in this particular matter discloses no substantive flaw in those policies and standards and no defect in the manner in which they were applied to this inmate. The policies, both in general and in their details, as far as we can tell from the record herein, appear to deal appropriately with the classification process and with one significant problem in the inmate population. They, themselves, have no penal qualities. They are managerial and remedial in nature, reasonably designed to deal with real and important issues of housing and custodial status within the parameters of an existing sentence, and not to impose sanctions for criminal acts. Moreover, by every indication, they were fairly applied to this inmate.
Hampton's ex post facto argument is based on the contention that he committed no new criminal acts since April 1989, the date of the crime for which he was serving the instant sentence, and therefore should not be subject to standards adopted after that date. The argument misconceives the situation at hand. Hampton was not being punished by new standards for an old crime. He was being received afresh into the prison system, and was subject to whatever administrative criteria were in place at the time of his reception as well as those that may have developed subsequently to deal appropriately with issues affecting the inmate population. No ex post facto violation occurs from the application, in a non-criminally-adjudicative mode, of a currently effective standard to deal with an existing issue bearing upon a present party. See, e.g., In re Coruzzi, 95 N.J. 557, 578, 472 A.2d 546, appeal dismissed sub nom. Coruzzi v. New Jersey, 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 8 (1984) (holding that "if the restriction of the individual occurs as an incident of the regulation of a present situation, it is not an ex post facto law"); Artway v. Attorney Gen. of New Jersey, 876 F.Supp. 666 (D.N.J.1995), aff'd in part and vacated in part, 81 F.3d 1235, 1267 (3d Cir.1996), reh'g denied, 83 F.3d 594 (3d Cir.1996) (concluding that the registration provision of New Jersey's Sexual Offender Registration Act does not offend ex post facto principles because its legislative aim was not to punish); cf. State v. Muhammad, 145 N.J. 23, 56, 678 A.2d 164 (1996) (stating that, in order to violate the ex post facto clauses of the State constitution, "the statute in question must either (1) punish as a crime an act previously committed, which was innocent when done; (2) make more burdensome the punishment for a crime, after its commission; or (3) deprive a defendant of any defense available according to the law at the time when the crime was committed"). The question before the Department was how this inmate was to be classified, i.e., housed and secured among other considerations, based upon his current status and recent history, by standards in effect at the time of classification and reasonably modified thereafter. We have been given no reason to apprehend, either, that the policies at issue or the standards embodied therein were *290 applied to this inmate arbitrarily, capriciously, or unreasonably.
The override applied to Hampton on the basis stated seems, in particular, to have been so far within the bounds of reasonableness as to preclude us from substituting our judgment for that of the Department in determining matters within its purview. See Campbell v. Department of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963). The Department is in the best position to determine, reasonably, the standards governing classification of inmates and, in the absence of a definable legal bar or the violation of a recognized procedural requirement, we are obliged to defer to its expertise. See Canavera v. Township of Edison, 271 N.J.Super. 125, 129, 638 A.2d 160 (App.Div.1994) ("Historically, our courts have accorded substantial deference to regulatory determinations made by administrative agencies charged with the responsibility of implementing legislative policy.") (citing Texter v. Department of Human Servs., 88 N.J. 376, 385, 443 A.2d 178 (1982)). We discern here no violation of any liberty interest which Hampton may have and no reason to conclude that he was treated unevenly.
There is considerable merit, however, to the argument that the policies at issue and the standards and procedures embodied therein must be promulgated in conformity with the APA. The criteria for determining whether the action of an administrative agency constitutes a rule-making, and are hence subject to the promulgation requirements of the Act, are set out in Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 478 A.2d 742 (1984):
[A]n agency determination must be considered an administrative rule when all or most of the relevant features of administrative rules are present and preponderate in favor of the rule-making process. Such a conclusion would be warranted if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. These relevant factors can, either singly or in combination, determine in a given case whether the essential agency action must be rendered through rule-making or adjudication.
[Id. at 331-32, 478 A.2d 742.]
The policies at issue unquestionably contain some provisions that are fairly within the statutory exemptions from the rule-making requirements of the APA as "(1) statements concerning the internal management or discipline of any agency; [or] intra-agency and interagency statements[.]" N.J.S.A. 52:14B-2(e). Nevertheless, by and large and on the whole, those policies are clearly within the statutory definition of "rule[s]," as "statement[s] of general applicability and continuing effect that implement[] or interpret[ ] law or policy, or describe the organization, procedure or practice requirements of [the] agency." Ibid.
The policy addressing the objective classification scoring process contains definitions and recitations of normative standards that are to be taken into account in classifying inmates, particular weights to *291 be accorded some of those standards in the classification process, and the general significance of other factors to which a specific weighting is not assigned. The policy specifies consideration of the inmate's history regarding prior assaultive offenses, institutional violence, alcohol/drug abuse, current detainers/open charges, prior felony convictions, and severity of current offense; the use and significance of the various scores attributed to the history factors; and the justifications for and impact of various custody classification overrides.
The substance abuse treatment policy and procedures instrument also contains definitions governing its applicability and impact, as well as a statement of policy goals bearing upon the identification and treatment of inmates meeting its criteria. It declares a "policy of zero tolerance for presumed substance abuse usage [which] holds the offender accountable for negative behavior by employing an escalating range of sanctions while continuing to offer treatment." The policy goes on to establish the use of "the Drug Scale section of the Addiction Severity Index (A.S.I.) to identify an offender's substance abuse severity[;]" and the consequences of various A.S.I. score levels both for intensity-of-therapy determination and classification assignment, including level-of-custody considerations. The policy spells out the roles and authority of case managers and institution classification committees in determining how covered inmates are to be treated therapeutically and in respect of prison life considerations. The consequences upon an inmate's custodial life of various types of evaluation are detailed, including those for "behavioral maladjustment" and departure from a therapy program against staff advice.
There is no question that the Department of Corrections is an agency to which the APA applies, see N.J.S.A. 52:14B-2(a); and there are few matters more important to an inmate than his custody classification, which bears directly on the quality of his life while imprisoned. Manifestly then, any of the Department's substantive standards affecting classification, whether embodied in policy statements or established by other means, meet the tests of Metromedia as matter requiring rule-making promulgation in conformity with APA requirements. See Bullet Hole, Inc. v. Dunbar, 335 N.J.Super. 562, 577-90, 763 A.2d 295 (App.Div.2000); compare State v. Garthe, 145 N.J. 1, 6-8, 678 A.2d 153 (1996); Doe v. Poritz, 142 N.J. 1, 95-99, 662 A.2d 367 (1995). It is obvious that the first four Metromedia tests and the sixth are satisfied by the nature and scope of the criteria embodied in the two policies, and the Department has given us no basis to conclude that the fifth test does not apply as well. The challenged policies are clearly quasi-legislative exercises designed to regulate the essential process of inmate classification. They establish substantive standards affecting the inmates in that regard. They have been articulated in pursuit of the Commissioner's general authority and discretionary powers to administer the Department and its work, and to create the rules by which statutory objectives are to be achieved. See N.J.S.A. 30:1B-6. In sum, they bear so importantly upon all inmates or large segments of the prisoner population in matters of classification as to call for adherence to the statutory standards for rule-making. See Doe v. Poritz, supra, 142 N.J. at 96, 662 A.2d 367.
Every agency action which qualifies as a rule-making by the standards of Metromedia must conform with APA requirements. In the absence of compliance with APA rule-making requirements, the standards at issue are not enforceable. See Metromedia, supra, 97 N.J. at 338, 478 A.2d 742 (holding that the standards upon which the Director of the Division of Taxation's calculation of a corporation's tax liability under the New Jersey Corporation Business Tax Act was based were valid as a facial matter, but that applications of those standards were impermissible because *292 they had not been promulgated in an administrative rule-making conforming with the requirements of the APA); Federal Pac. Elec. Co. v. New Jersey Dep't of Envtl. Prot., 334 N.J.Super. 323, 342-43, 759 A.2d 851 (App.Div.2000) (holding that the remediation standards promulgated by the DEP were invalid because the DEP did not comply with the APA's rule-making procedures); D.I.A.L., Inc. v. New Jersey Dep't of Cmty. Affairs, 254 N.J.Super. 426, 438, 603 A.2d 967 (App.Div.1992) (stating that "[a]ny regulation not promulgated in `substantial compliance' with the APA procedures is invalid"); K.P. v. Albanese, 204 N.J.Super. 166, 180, 497 A.2d 1276 (App.Div.), certif. denied, 102 N.J. 355, 508 A.2d 225 (1985) (concluding that the "challenged regulations [we]re invalid for failure to comply with the formal rulemaking procedures of the APA").
Manifestly, however, the State prison system cannot operate efficiently without standards and procedures for classifying prisoners. We have held that there is nothing in the policies under review as they bear upon the classification process that is inherently flawed. Except for the failure to conform with APA requirements, we discern no substantive reason for invalidating the policies either facially or in application either to this appellant or more broadly. We hold only that they must be promulgated in conformity with APA requirements. Compare Metromedia, supra, 97 N.J. at 337-38, 478 A.2d 742. Nevertheless, "a procedural defect of this nature in the adoption of a policy change or clarification is cured by the proper adoption of a formal rule thereafter." Walker v. Department of Corrections, 324 N.J.Super. 109, 113, 734 A.2d 795 (App.Div.1999). Accordingly, in order to avoid sudden disruption of an essential mechanism which we discern to be substantively necessary and appropriate, and which would perforce be annulled without special provision, we stay the invalidation of the substantive standards of the two policies under review for a period of 120 days to afford the Commissioner and the Department ample opportunity to bring the policies and processes under review into APA compliance by employing emergency and regular procedures for rule promulgation as provided in N.J.S.A. 52:14B-4 to -5. See Bullet Hole, supra, 335 N.J.Super. at 589-90, 763 A.2d 295; cf. In re Producer Assignment Program, 261 N.J.Super. 292, 302-03, 618 A.2d 894 (App.Div.1993).
The matter is remanded to the Department of Corrections for promulgation of the policies under review as rules in accordance with the requirements of the Administrative Procedure Act. Invalidation of the policies is stayed for 120 days to permit such compliance to occur. In the interim, and thereafter if rules promulgation occurs as ordered, the use of those policies in inmate classification is affirmed. See Walker, supra, 324 N.J.Super. at 113, 734 A.2d 795.